UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

UNITED STATES OF AMERICA    *

                                   *

VS.                          *    C.A. B-04-015

                                   *

$155,895 U.S. CURRENCY    *

*****************************************************

ORAL DEPOSITION OF

ESTEBAN MARTINEZ, SR.

APRIL 5, 2006

*****************************************************

ORAL DEPOSITION OF ESTEBAN MARTINEZ, SR., produced

as a witness at the instance of the Plaintiff, and duly

sworn, was taken in the above-styled and numbered cause

on the 5th day of April, 2006, from 1:20 p.m. to 2:08

p.m., before DIANA LEAL WEIBEL, Certified Shorthand

Reporter, in and for the State of Texas, reported by oral

stenography, at the United States Attorney's Office, U.S.

Courthouse, 600 East Harrison, Suite 201, Brownsville,

Texas, 78520, pursuant to the Federal Rules of Civil

Procedure and the provisions stated on the record or

attached hereto.

CERTIFIED COPY

Exhibit H



DIANA LEAL WEIBEL, C.S.R. #4192
P.O. BOX 608, MISSION, TX 78573
TEL. (956) 580-2778 / CELL 330-9180 / FAX 580-3148

1  record because nods and things can't be taken down.

2      A    Yes.

3      Q    And then if we could just, if I go too fast,

4  let me know.  And if you could also go slow enough for

5  the interpreter to take down the questions and answers.

6      A    Yes.

7      Q    Okay.  First, Mr. Martinez, what I would like

8  to do is to cover in the Notice of Deposition, we

9  requested that you bring documents today, and I would

10  like to go through those, if that's okay?  Okay.  The

11  first --

12      A    Yes.

13      Q    The first category of documents I think we

14  have taken care of that today, and that would be the

15  individual income tax returns for tax years 2000

16  through 2004.  And I believe that you and your attorney

17  signed an authorization today for all your tax returns

18  for those years.

19      A    Yes.

20      Q    Okay.  And then in item three (3) in the

21  Notice of Deposition, we've requested that you bring

22  any documentation or evidence that relates to or

23  reflects your ownership of the money that we're here

24  for today, the $155,895, your portion; and also where

25  the money came from, any documentation or evidence that

1  would support your statement as to where the money came

2  from.  Do you have -- did you bring anything in that

3  category today?

4      A    No.  Did I?

5           MR. FOURT:  And for the record, I think

6  most of the documents that would pertain to Esteban,

7  Sr. would be the settlement proceed checks which have

8  been tendered, and then bank records which I don't

9  believe he brought with him.

10     A    (Witness responding in Spanish.)

11          MR. FOURT:  But with the Texas State Bank

12 authorization, we should be able to get all the records

13 that you need.  So, other than that, I don't think

14 there is anything.

15          AUSA HADEN:  Okay.  Was he adding

16 something?  I'm sorry?

17     A    I have them with me.  No, that's it.

18     Q    (AUSA Haden)  And going to the next category,

19 let's see.  I think we're almost through.  We did --

20 for the record, Mr. Martinez has signed an

21 authorization for release of the bank records.

22     A    Yes.

23     Q    And then the only other items were documents

24 that would reflect your household monthly living

25 expenses for January, 2002 through August, 2003.  Did

1     A     No.

2     Q     Okay.  Why don't we go ahead and get right to

3  -- let me ask you one other question though.  I mean,

4  since you've been retired at age 62, have you been

5  involved at all with any of the businesses of any of

6  your children?

7     A     No.  No.  Only work.

8     Q     No involvement with purchasing tractor-

9  trailers or trucks?

10    A     No.

11    Q     So, can you recall -- getting to the money

12  that was taken or recovered by police in this case, how

13  much of the money are you -- what is your interest in

14  the money, or do you own any of the money?

15    A     Yes.

16    Q     And how much of that money do you own?

17    A     $15,000 dollars.

18    Q     And can you tell me where that money came

19  from?

20    A     It was money that was given to me from my

21  wife, yes.

22    Q     Did it come from the legal settlement

23  involving your wife?

24    A     Yes.

25    Q     And did you receive that -- was it about

1    $129,000 dollars?

2        A    Yes.

3        Q    Was that the entire amount?

4        A    Yes.

5        Q    And when you received the $129-some-odd

6    dollars, did you -- what did you do with that check?

7        A    Well, I put my money into the bank, but then I

8    withdrew it.

9        Q    Okay.  So, when you -- can you tell me about

10   when you deposited it into your bank?

11       A    No, I don't remember.

12       Q    Was it soon after you received it?

13       A    No, I don't remember when.

14       Q    What was the name of the bank?

15       A    What's the name of that bank?

16           AUSA HADEN:  I know you have the

17   information.

18           MR. FOURT:  Texas State Bank.

19       Q    (AUSA Haden)  And how many accounts do you

20   have at Texas State Bank?

21       A    Only the savings account where I get my check.

22       Q    Okay.  So, do you have a checking account at

23   Texas State Bank?

24       A    Yes, savings account.

25       Q    Do you have a checking and a savings, or just

1    one account?

2        A    No, just a savings account.

3        Q    And Mr. Martinez, has your bank remained the

4    same, the account remained the same since you deposited

5    the check for your wife's legal settlement?

6        A    No.  No.

7        Q    Okay.  Can you tell me --

8        A    I have made payments.

9        Q    Okay.  Let me re-word this.  Did you deposit

10   the check at Texas State Bank?

11       A    Yes.

12       Q    Into your savings?

13       A    Yes.

14       Q    And is that still the only -- do you still

15   have that account at Texas State Bank?

16       A    Yes, so I can receive my check.  That's the

17   only -- that's the only reason.

18       Q    And Mr. Martinez, do you have any other

19   accounts at any other financial institutions?

20       A    No.

21       Q    Now, you don't really recall when you

22   deposited the check from your wife's legal settlement.

23   Have you made any withdrawals from your --

24            AUSA HADEN:  I'm sorry.  Let me strike

25   that.

1    Q    (AUSA Haden)  How much did you have in your

2  savings when you deposited your wife's $129,000

3  dollars?

4    A    No, I don't remember, but I had a little bit.

5    Q    Well, can you give me -- was it under $5,000

6  dollars?

7    A    Yes, yes, very little.

8    Q    And after you made the deposit of the check,

9  what withdrawals did you make from your savings account

10  from that check?

11    A    I did several withdrawals.

12    Q    Can you kind of tell me -- tell me what those

13  withdrawals were.

14    A    Well, to make payments.

15    Q    Okay.  Well, let me go to -- you say that

16  $15,000 of the money that was taken was withdrawn from

17  your savings account.  Can you tell me when that

18  occurred?

19    A    I don't remember.

20    Q    Do you remember why you took it out?

21    A    Because I had to have money at home.  In a

22  safety box I had money.  That's why I withdrew it.

23    Q    Okay.  You don't remember when?

24    A    No.

25    Q    How much money did you keep in your safety

1    deposit box in your house?

2         A    $20 or $25,000 dollars.

3         Q    And that's how much you would always -- would

4    you regularly keep that amount in your house?

5         A    Yes.  When I received the money, yes, I did.

6         Q    And then you would spend it on different

7    things?

8         A    Yes, making payments.

9         Q    Making payments on what?

10        A    Things that we owed, from my wife's doctors,

11   medications and all that.

12        Q    And that was not covered by the lawsuit?

13        A    No.  Well, not the medications, not outside

14   medicines, before she was admitted to the hospital.

15        Q    I see.  Did you own your house?

16        A    Yes.

17        Q    Now, at what point did you give the $15,000 to

18   Omar?  What date?

19        A    It was in November or December of 2002.

20        Q    And was it just part of the money you kept at

21   your house?

22        A    Yes.

23        Q    And did Omar come -- what caused you to give

24   the money to Omar?  Why did you give the money to Omar?

25        A    He asked me -- he asked me to borrow him money

1    so he could open a business.

2        Q    And did he come to your house and ask you, or

3    how did it come about?

4        A    Yes.  Yes, there at my house.

5        Q    And he just -- did he tell you why he wanted

6    to borrow the money?

7        A    Just for a business, but I didn't...

8        Q    Did you ask him anything about the business,

9    any details?

10       A    No.  No, just a business.

11       Q    And did you -- with this $15,000, did you have

12   any kind of agreement with him as to whether he would

13   repay you, or what was the terms of you giving him this

14   $15,000 dollars?

15       A    No, well, just that he was going to open that

16   business and...

17       Q    Did you expect him to pay you back?

18       A    Yes.

19       Q    Did you discuss that?

20       A    No.

21       Q    So, I guess I'm trying to understand.  Did you

22   give him the money or did you loan him the money?

23       A    I loaned him the money.

24       Q    But you didn't have any connection with the

25   business or any involvement in the business yourself?

1  A No.

2  Q So, after you gave him the $15,000 dollars,

3 did you see the money after that?

4  A No.

5  Q Do you remember if the money was packaged any

6 certain way, or how was the money put together when you

7 gave it to him?

8  A No, I just gave it to him, the money.

9  Q After you loaned him or gave him the $15,000,

10 did you ever after that point have any discussions

11 about any particular business that he was going to

12 acquire?

13  A No.  No.

14  Q Was anybody else present when this happened?

15  A No.

16  Q Did Omar ever repay you the money?

17  A No.

18  Q And Mr. Martinez, do you know or have you

19 heard of any individual named Rafael Reyna?

20  A No.

21  Q And during this time, Mr. Martinez, if I could

22 ask you, between 2000 and 2004, did you make any large

23 purchases of property or any other type of acquisition?

24  A No.  No.  What I bought was just a truck, a

25 Expedition.

1    Q    And that's kind of within the category of what

2    I'm -- that's what I'm talking about.  Mr. Martinez,

3    could I ask you, you said you bought a truck?

4    A    An Expedition.

5    Q    And when was that?

6    A    Why did I buy it?

7

8    Q    Did you buy it?

9    A    Yes.

10    Q    When?

11    A    I took money out of the bank, about $20,000

12    dollars.

13    Q    Okay.  And can you tell me about when that

14    was?

15    A    No, well, a long time ago when we received my

16    wife's check.

17    Q    So, sometime after August, 2000?

18    A    (No response.)

19    Q    May I add, sometime after you received the

20    legal settlement?

21    A    No.  No.

22    Q    So, what money did you use to buy the truck?

23    A    The truck, yes.  I haven't bought any bus or

24    truck.  It was an Expedition.

25    Q    I'm sorry.  The Expedition.

1    A    Yes.  There at that same bank where I

2  deposited the money, that's where I withdrew the money.

3  That's where they gave me the money.

4    Q    Okay.  So, I'm understanding you then.  This

5  came from the amount from your wife's legal settlement?

6    A    Yes.

7    Q    Did you make any other acquisitions of any

8  kind of property, whether it be real estate, vehicles,

9  or any other type of property other than the

10  Expedition?

11    A    No.

12        MR. FOURT:  Katherine, I'm sorry.  I

13  don't mean to interrupt.  I'm told by Omar that he did

14  buy and sell at least one piece of property during that

15  time period he might not remember.  Ask him about some

16  real estate.  He bought something and then sold it.

17        MR. OMAR MARTINEZ:   A corner lot where I

18  live.

19        AUSA HADEN:  Okay.  Thank you, Paul.

20        MR. FOURT:  I don't know anything about

21  it other than they just mentioned it, so you might as

22  well cover it while we're here.

23        AUSA HADEN:  Sure.  I'm sorry.  Did we

24  get a -- do I need to go back?  Let's go back to that

25  last question, if you don't mind.

1    THE REPORTER:  Question:  "Did you make
2   any other acquisitions of any kind of property, whether
3   it be real estate, vehicles, or any other type of
4   property other than the Expedition?"

5    AUSA HADEN:  Okay.  Why don't we repeat
6   it?  Do you want me to repeat it?

7    THE INTERPRETER:  Would you be so kind?

8    AUSA HADEN:  Sure.

9    Q    (AUSA Haden)  Mr. Martinez, other than the
10  Expedition, did you purchase any other property,
11  whether it be real estate, vehicles or any other type
12  of property?

13    A    No.

14    Q    Did you purchase any real estate, a lot, land?

15    A    No.

16    MR. FOURT:  Can we go off the record real
17  quick?

18    AUSA HADEN:  Sure.

19    (Brief discussion off the record.)

20    A    The thing is that I don't remember.

21    Q    (AUSA Haden)  Okay.  Now that Omar has
22  refreshed your memory, can you tell us what that was?

23    A    It was a piece of land with a trailer there.

24    Q    And how much did you purchase or how much did
25  you -- did you pay cash?

1    A    Yes.

2    Q    And how much was it?

3    A    I think it was 14.

4    Q    And Mr. Martinez, do you know how much, do you

5  have any money in your bank account now?

6    A    Just a savings account.

7    Q    Do you know how much is in there now?

8    A    I must have about $200 dollars.

9    Q    How much cash do you have now?  Do you have

10  any cash on hand at your house?

11    A    Not now.

12    Q    Not now.  And can you tell us -- and I'm

13  trying to say this as -- you know, so it's not

14  confusing, but what else did you spend the money on,

15  the $129,000?

16    A    Well, my daughter, she does the housework for

17  me, and I have to pay her.  I have been a widow for

18  eight years, eight years that I have been spending

19  money for all that.

20    Q    So, just everyday living expenses; no other

21  major purchases?

22    A    No.

23    Q    Okay.  And Mr. Martinez, have you owned any

24  property or cash for that matter that has been a

25  subject of a forfeiture proceeding?

1      A     Who?

2      Q     Do you know -- what is Irma's husband's name?

3      A     Juan Zamora.

4      Q     And do you know or are you familiar with him

5  having been convicted several times for narcotics

6  offenses?

7      A     Well, he was in jail, but he's in Mexico now.

8      Q     And what about -- let's see.  I think I've

9  covered it.  And then Armando, were you familiar with

10  his case when he was arrested and convicted in Florida

11  in 1992?

12      A     No.

13      Q     Did you know that he was arrested in 1998 for

14  -- along with his wife's brother and that there was 125

15  pounds of marihuana that was seized in that case?

16      A     No.

17      Q     You weren't aware of that?

18      A     No.  No, I didn't.

19            AUSA HADEN:  I pass the witness at this

20  time.

21            MR. FOURT:  I just have a couple of

22  clarification questions.

23  BY MR. FOURT (2:00 p.m.):

24      Q     Sir, the piece of property that you bought for

25  $17,000, you sold that after you bought it; correct?

1    A    Yes.

2    Q    How much did you sell it for?

3    A    I sold it for, I think 28.

4    Q    You made a good deal.

5    A    Yes.

6    Q    They were asking you earlier about who was

7    arrested and had been charged with drugs.  Did you

8    understand the question about who they were talking

9    about?

10    A    They told me Armando.

11    Q    I think she might have been talking about

12    Omar.

13    A    Oh, yes?

14    Q    So, is it possible you were confused, sir?

15    A    No, well, anyways I didn't know.

16          MR. FOURT:  I have no further questions.

17    I think he might have been confused on who you were

18    talking about.

19          AUSA HADEN:  Can I just ask one other

20    question about the real estate --

21          MR. FOURT:  Okay.

22          AUSA HADEN:  -- now that we brought that

23    up again.

24    BY AUSA HADEN (2:02 p.m.):

25    Q    When did you sell the real estate for $28,000?

1   When?

2       A   I don't remember.

3       Q   Was it within the last year or two years?

4       A   I think about -- I think it was about 2000.

5       Q   Mr. Martinez, I'm understanding that you do

6   have -- do you have some paperwork at home that

7   reflects your purchase of the property and your later

8   sale of the property?

9          MR. FOURT:  Señor, un momento (Spanish).

10  I think --

11         AUSA HADEN:  Because maybe you guys can

12  provide --

13         MR. FOURT:  It's been produced.  No, I

14  think it's in here on the sale.

15         MR. DE LA FUENTE:  Is it in there?

16         MR. OMAR MARTINEZ:  I don't know if it's

17  in there, Oscar, but you do have the paperwork.  I

18  don't know if it's in there per se.

19         MR. DE LA FUENTE:  Well, we'll produce

20  that, I mean, --

21         MR. FOURT:  I think we've given -- it's

22  either in what we've already given you, --

23         AUSA HADEN:  If I don't have it, I'll let

24  you know.

25         MR. FOURT:  -- or we have it in the

1  office on the sale of this corner lot.

2          AUSA HADEN:  What about the purchase?  Do

3  we have the purchase?

4          MR. FOURT:  We have documents.  The

5  purchase and the sale.  I assume it's the same thing.

6  We have those documents.  They do exist.

7          AUSA HADEN:  Okay.  Great.

8          MR. FOURT:  You either have them, or

9  we'll give them to you.

10          AUSA HADEN:  Okay.  And just one last

11  question.

12      Q    (AUSA Haden)  The Expedition that you

13  purchased for $20,000, who did you purchase it from?

14      A    The Ford dealership in McAllen.

15      Q    Okay.  And do you have the paperwork from

16  that, from your purchase of the Expedition?

17      A    No.  I already sold it.  I already sold it,

18  and I bought another one.

19      Q    Okay.  I was under the impression you didn't

20  buy anything else.  Okay.  You sold the Expedition.

21  When did you sell the Expedition?

22      A    I don't remember, but...

23      Q    Do you remember how much you sold it for?

24      A    Well, I got another vehicle.

25      Q    So, did you trade it in to the dealership?

1    A    Yes, a Dodge dealership.

2    Q    And what did you purchase after that?

3    A    A Dodge.

4    Q    You bought a Dodge.  So, you traded it in at a

5 Dodge dealership?  What's the name of the dealership?

6    A    I don't know the name.  It's next to -- it's

7 next to the Ford dealership.

8    Q    And I'm sorry.  Is that in Mercedes?

9    A    No, in McAllen.

10    Q    Oh, McAllen.

11    A    McAllen.

12    Q    And you bought a Dodge.  What is it, a car or

13 a truck?

14    A    A truck, a Dodge truck.

15    Q    And how much was the truck?

16    A    Well, that was about 24.

17    Q    About $24,000?

18    A    Yes.

19    Q    Do you remember how much you got back or how

20 much the trade-in was for the Expedition?

21    A    They told me at the beginning that they were

22 going to give me $18,000, but at the end, you know,

23 they don't give you anything.

24    Q    Okay.  Mr. Martinez, I just want to make sure.

25 Is there any other -- anything that we haven't covered

1    that, you know, we spoke about, because there was a lot

2    that we now have talked about.  And there's two

3    vehicles.  There's a Dodge, and then there's an

4    Expedition.  Is there any other property that you

5    purchased after the legal -- you received the legal

6    settlement?

7          A    Not that I remember of.

8          Q    Okay.  If for some reason you find or remember

9    or recall that you did purchase any other property,

10   would you inform us about that as soon as possible?

11         A    Yes.

12         Q    Or inform your attorney?

13         A    Yes.

14         Q    And would you go home and at least look

15   through your records to make sure you've covered

16   everything?

17         A    Yes.

18         Q    And if you run into any records concerning the

19   Dodge truck or the Expedition, would you please provide

20   those to your attorney?

21         A    Uh-huh (moving head up and down).  Yes.

22              MR. FOURT:  And I think, just for the

23   record, the documents on the sale of that piece of

24   property are in there.  The sale and the purchase.

25              MR. DE LA FUENTE:  They were in request

1    for production number nine (9).

2                    AUSA HADEN:  Okay.  Great.  And also the

3    purchase as well?

4                    MR. FOURT:  Well, not -- yes, the

5    purchase and the sale of the property.

6                    AUSA HADEN:  So it would cover both

7    sides.

8                    MR. DE LA FUENTE:  That corner lot he's

9    talking about, that's in here.

10                   AUSA HADEN:  Okay.  All right.

11                   MR. FOURT:  I have no questions.

12                   MR. DE LA FUENTE:  I don't have any.

13                   [Deposition concluded at 2:08 p.m.]

14

15

16

17

18

19

20

21

22

23

24

25