UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br>Plaintiff,<br><br>v.<br><br>$155,895.00 UNITED STATES CURRENCY<br>Defendant. | §<br>§<br>§  CIVIL ACTION NO. B-04-015<br>§<br>§<br>§<br>§<br>§ |

UNITED STATES' RESPONSE TO CLAIMANTS' MOTION FOR ORDER
COMPELLING DISCOVERY AND/OR MOTION TO EXCLUDE
EVIDENCE PURSUANT TO FED.R.CIV.P. 37

On July 27, 2006, Claimants, Esteban Martinez Jr., Esteban Martinez Sr., and Julissa Trevino, filed a motion requesting this Court to bar the government from offering evidence at trial that a drug-detection dog positively alerted to the odor of a controlled substance on the Defendant Currency, or on or inside items containing the Defendant Currency. They argue the evidence should be excluded because the seized currency is no longer available for examination and testing by Claimants.

As discussed below, the Claimants' motion should be denied since there is no likelihood that any testing of the Defendant Currency, at this late date, could provide helpful evidence for the Claimants. Regardless, the Claimants' designated expert is not qualified to conduct the type of examination or tests the Claimants

allege they would have performed had the currency been available. In any event, to impose a sanction against the government for failure to preserve evidence for testing, the Claimants would have to establish the government acted in bad faith–which they have failed to allege or establish. Even if Claimants could show bad faith, the suppression of evidence would be an inappropriate sanction.

Further, should the Court permit the Claimants to present evidence or arguments at trial suggesting they could have made certain determinations had the Defendant Currency been preserved, the United States requests permission to rebut such evidence with the testimony of a qualified expert, Dr. Kenneth Furton, PhD, or if he has a scheduling conflict, his counterpart, Dr. Stefan Rose.[1]

I.

On April 6, 2006, nearly three years after the seizure of Defendant Currency, the Claimants filed a Request for Production and Inspection of Evidence requesting the United States to produce the Defendant Currency for scientific

---

[1] Dr. Furton is an expert in the field of Analytical Chemistry and Forensic Science. He is Professor of Chemistry and Biochemistry, Associate Dean of Arts and Sciences, and Founder and Co-Director of International Forensic Research Institute at Florida International University. He holds a PhD in Analytical Chemistry and has years of training and experience in the study of odor signatures. Dr. Stefan Rose is a medical doctor with years of training and experience in the field of forensic toxicology. He is also a professor at Florida International University. Both men have conducted extensive research, and published numerous articles on the scientific aspects of dog sniffs and have been retained to offer expert opinions on this subject in numerous state and federal cases.

inspection. The United States responded that it did not have control or possession over the Defendant Currency since it was exchanged for a cashier's check, made payable to the United States Marshal's Service, in August 2003. The Defendant Currency was seized on August 4, 2003. Three weeks later, on August 25, 2003, the Defendant Currency was transferred to a cashier's check at Texas State Bank in accordance with the policy of the United States Attorney General's Guidelines on Seized and Forfeited Property.[2]

The Claimants argue, in support of their suppression motion, that the government's *sole* evidence for establishing a connection between the Defendant Currency and a controlled substance offense is the presence of residue on the currency (i.e. that the government has alleged that the cash was tainted or somehow "covered" with residue of an unknown illegal narcotic). This argument is misplaced for two reasons.

## II.

---

[2]The Attorney General's Guidelines on Seized and Forfeited Property, para. 7 (July 1990) provides that all seized currency is to be delivered to the U.S. Marshals Service (USMS) for deposit in the USMS Seized Asset Deposit Fund within 60 days after seizure. Photographs or videotapes of the seized cash should be taken for later use as evidence when appropriate. Limited exceptions to DOJ's cash management policy, including extensions of time limits, will be granted only with the express permission of the chief of AFMLS. Retention of currency is permitted when it serves a significant independent, tangible, or evidentiary purpose. DOJ, Asset Forfeiture Policy Manual, Seized Cash Management (January 2006). The above policy recognizes the security, budgetary and accounting problems caused by the retention of large amounts of cash.

First, the United States relies on numerous factors to prove circumstantially that the Defendant Currency is drug proceeds or was furnished or intended to be furnished in exchange for a controlled substance. The applicable evidence and case law will be detailed in the United States trial brief to be filed with the Court.

Second, it appears the Claimants are confusing the presence of an "odor" with the presence of a "measurable physical residue." The United States has asserted that the drug-detection dog in question, "Kei", alerted to the "odor" of a controlled substance on and inside the items containing the Defendant Currency. Kei also alerted to the odor of a controlled substance on the cash ($1945) that Omar Martinez carried on his person (*See* Government's complete response to Interrogatory # 7, pp. 3, 6, attached as Exhibit "A"). Kei's positive alert to the odor of a controlled substance on the currency is evidence that the currency had recently, or just prior to packaging, been exposed to a substantially higher concentration of odor or smell of a controlled substance than the general population of money. *See United States v. Funds in the amount of $30,670.00*, 403 F.3d 448, 458-60 (7th Cir. 2005)(Court took judicial notice of published tests by Dr. Kenneth Furton and Dr. Stefan Rose concluding that a positive alert to currency by a properly trained canine indicates that the currency contains a significant quantity of narcotic odor by recent close or actual proximity to a

4

significant amount of narcotics).

Officer Ramiro Martinez testified at his deposition that he did not find any controlled substances, only the Defendant Currency, and that the drug-detection dog "Kei" alerted to the "odor" of a controlled substance (*see* Deposition, at pp. , attached as Exhibit "B").[3] Kei's trainer, Michael Laney, will testify at trial how he trained and tested his dogs to detect the presence of two or more grams of four different controlled substances (cocaine, heroin, marijuana, and methamphetamine), as well as, to detect the odor of the above controlled substances on an item that had recently been exposed to the controlled substance. From his observations, the dog's ability to alert to the "odor" on an exposed item decreased with time as the odor dissipated.

The police officers who counted the Defendant Currency did not report that they observed physical residue of a controlled substance on the Defendant Currency. If they had, they certainly would have collected and tested the surface of the bills for physical residue to indicate the amount of recent contamination of controlled substance particles. Because no visible residue of a controlled

---

[3] In their motion, claimants attempt to discredit the dog handler's deposition testimony regarding what conclusions to draw from the drug-detection dog's positive alert, including the possibility that the items alerted to could have been contaminated by other luggage in the storage area of the bus. Their argument goes to the weight of the evidence, not its admissibility.

substance was observed, the positive dog alert is probative evidence that the dog alerted to the "odor" of a controlled substance and not to the presence of two or more grams of a controlled substance.

There is no known test for the presence or amount of drug odor chemicals (odorants) on currency, other than the smell by a drug-detection dog. An odorant has a limited life since it dissipates with time. Therefore, an exhibit re-tested for odor nearly three years after-the-fact by a drug-detection dog would have questionable value. *See $30,670.00*, 403 F.3d 448, 457-60 (The Court recognized that published studies by Dr. Fulton and Dr. Rose established to a reasonable scientific certainty that a narcotics detection dog will not alert to most currency in general circulation tainted with microscopic traces of cocaine, but only to the odor of methyl benzoate (the chemical by-product of cocaine), which evaporates from the currency within a short period of time. Currency recently exposed to cocaine and returned to general circulation will quickly lose any detectable odor even if the particles of cocaine remain). Accordingly, the Claimants have failed to make even a threshold showing that an inspection of the Defendant Currency, almost three years later, could have resulted in the discovery of useful evidence.

In any event, Claimant Omar Martinez has designated Joe Rubio as an expert, to testify concerning probable cause, validity of search and seizure,

training and use of canine in question, training of the canine handling officer, and custody and accounting of seized currency. According to Joe Rubio's resume, he has received no experience, training, or certification, to handle and/or train dogs on the detection of the presence or odor of a controlled substance – contrasted with Officer Ramiro Martinez's resume and certifications by the National Narcotic Detector Dog Association (NNDDA) which reflect that Officer Ramiro Martinez has been trained and educated as a canine handler, has eight years experience as a canine handler, and has trained and worked with two dogs, including Kei, to detect controlled substances (Rubio's resume is attached as Exhibit "C", and Ramiro Martinez's resume is attached as Exhibit "D"). More importantly, the resume reflects that Joe Rubio did not receive the level of education or training in forensic science or chemistry to qualify him to provide expert opinions as to whether there was any controlled substance residue on the currency, what type of controlled substance was present, whether the dog alerted to another smell, or whether the dog alerted to the container rather than Defendant Currency under the "contamination theory."

Consequently, even if retention of the Defendant Currency would have provided potentially favorable evidence following an examination or testing at this late date, the Claimants' "expert" is unqualified to perform, much less, testify

about such examination or tests. As such, the Claimants' motion is completely baseless.

III.

Notwithstanding the above, even if Claimants had a valid claim (which they do not), they would not be entitled to suppression of the dog sniff as their remedy. The undersigned was able to locate one civil forfeiture case in which the court addressed the same argument raised herein. In *United States v. $28,980 in United States Currency*, 786 F.Supp. 899, 905 (D. Oregon 1990), the claimant moved to exclude evidence of a drug-detection dog's positive alert to currency since the currency was converted to a cashier's check and no longer available to test. The district court applied the test set forth in *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528 (1984), for determining whether the failure to preserve potentially exculpatory evidence violates a criminal defendant's constitutional right to due process. First, the unpreserved evidence must "possess an exculpatory value that was apparent before the evidence was destroyed" . . . and second, the evidence must "be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* 467 U.S. at 488, 104 S.Ct. at 2533 (Held due process clause does not require law enforcement officers to preserve breath samples in order for state to introduce breath analysis tests at trial.

8

The samples did not possess an apparent exculpatory value, and defendants had alternative ways to test accuracy of the breath test or to show their innocence).

Although the court in *$28,980 in United States Currency* was not confronted with a criminal defendant's due process rights, it nevertheless, applied the same test. In denying the claimant's request to exclude evidence of the positive dog alert, the court concluded that there was no evidence that the government deposited the currency into a bank in bad faith. Moreover, the claimant could still challenge the accuracy of the dog sniff. 786 F.Supp. at 905. *See also United States v. Dela Espriella*, 781 F.2d 1432, 1437 (9th Cir. 1986)(Defendant argued that the failure to retain currency following dog's positive alert to the odor of cocaine on the currency deprived him of the ability to test the money for traces of cocaine or to retest the dog's ability to detect the drug on the currency. The Court held he did not satisfy the *Trombetta* test since the currency would not necessarily have been exculpatory and the defendant had the opportunity to question the reliability of the dog).

In the criminal context, the Supreme Court has clarified that the failure to preserve evidentiary material of which no more can be said other than it could have been subjected to tests, the results of which might have exonerated the defendant, does not violate due process unless the defendant can show the police

acted in bad faith. *Arizona v. Youngblood*, 488 U.S. 51, 57, 109 S.Ct. 333 (1988)(State failed to preserve semen in sexual assault case). The Supreme Court's condition of bad faith recognizes that "[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown, and very often, disputed." *Trombetta*, 467 U.S. at 486, 104 S.Ct. at 2532. Moreover, "'the fundamental fairness' requirement of the Due Process Clause, [does not impose] on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Youngblood*, 488 U.S. at 58, 109 S.Ct. at 337.

A requirement of bad faith limits the extent of the police's obligation to preserve evidence to reasonable grounds and confines it to those cases where the interests of justice most clearly require it. *Id. Accord Illinois v. Fisher*, 540 U.S. 544, 548, 124 S.Ct. 1200, 1202 (2004)(State failed to preserve cocaine for testing). The applicability of the bad-faith test depends not on the centrality of the contested evidence to either side's case, but on the distinction between "materially exculpatory" evidence and "potentially useful" evidence. *Id.*, 540 U.S. at 549, 124 S.Ct. at 1203.

The courts have also required civil litigants to show bad faith before

10

sanctioning a party for failing to preserve evidence. In civil cases, the remedy for intentional and bad faith destruction of evidence is to allow the jury to be instructed that they may, but are not required to, draw an inference that the destroyed evidence would have been unfavorable to the party who destroyed the evidence. *See King v. Illinois Central Railroad*, 337 F.3d 550, 556 (5th Cir. 2003)(An adverse inference based on the destruction of potential evidence is predicated on the 'bad conduct' by the party who destroyed the evidence); *United States v. Wise*, 221 F.3d 140, 156 (5th Cir. 2000)(Absent a showing of bad faith, failure to produce records is insufficient to warrant a spoliation or missing evidence instruction). *See also United States v. $94,000.00 in United States Currency*, 2 F.3d 778, 787 (7th Cir. 1992)(Government's destruction of document in civil forfeiture case was not done in bad faith, and the potential usefulness of evidence was speculative); *United States v. One 1972 Mercedes-Benz 250*, 545 F.2d 1233, 1235 (9th Cir. 1976)(In civil forfeiture case, there was no evidence the government acted in bad faith in destroying cocaine).

Here, the Claimants have failed to allege, much less establish, that the government converted the Defendant Currency to a cashier's check in bad faith. "The record contains no allegation of official animus towards [claimants] or of a conscious effort to suppress exculpatory evidence." *Trombetta*, 467 U.S. at 2534,

104 S.Ct. at 488. The Harlingen police waited three weeks after the August 4, 2003, seizure to deposit the currency. In the interim, no claim was brought against the Defendant Currency. Nor were requests made to examine or test it. The procedures were consistent with DOJ policy to transfer the cash to a cashier's check for security, budgetary and accounting purposes. Nothing occurred to cause law enforcement officers to question Kei's reliability, or to believe that an independent test of the currency would provide evidence that would materially help any future Claimants in this case.

Although Omar Martinez initially made an administrative claim to the Defendant Currency in October 2003, the first request to inspect or test the currency did not come until April 2006, almost three years after the seizure of the currency. *See generally King*, 337 F.3d at 556 (Where King asked to view evidence almost three years after the accident, after the evidence had already been destroyed for innocuous reasons, he failed to show a bad faith motive and the district court correctly refused to afford him an adverse inference to create an issue of fact on his claim).

### IV.

For the foregoing reasons, the Claimants' motion for order compelling discovery and/or motion to exclude evidence pursuant to Fed.R.Civ.P. 37 should

be denied. In the event the Claimants are permitted to present evidence or speculative arguments at trial suggesting they could have made certain determinations had the money still been available for examination or testing, the United States requests permission to rebut or counter such evidence and/or arguments with the expert testimony of Dr. Kenneth Furton, PhD., who has performed extensive research and testing in this area, to testify, among other matters, that there are no known tests for the presence or amount of drug odor chemicals (odorants) on currency–other than the smell by a drug-detection dog; and an exhibit re-tested for odor three years after-the-fact would have questionable value.

                Respectfully submitted,

                DONALD J. DeGABRIELLE, JR.
                United States Attorney

                */s/ Katherine L. Haden*
                KATHERINE L. HADEN
                Attorney-in-Charge
                Texas Bar No. 08677500
                Assistant U.S. Attorney
                910 Travis, Suite 1500
                P.O. Box 61129
                Houston, Texas 77208
                Phone: 713-567-9365
                Facsimile: 713-718-3404

## CERTIFICATE OF SERVICE

I, Katherine L. Haden, Assistant United States Attorney, do hereby certify that a true and correct copy of the above and foregoing has been served on counsel of record via Certified Mail, Return Receipt Requested, on August 2, 2006, addressed to:

Attorneys for Claimants

Mr. Oscar De La Fuente, Jr.
Rio Grande Law Center
501 E. Tyler
Harlingen, Texas 78550
Telephone: (956) 425-5297
Facsimile: (956) 425-1844

Mr. Paul Fourt
1000 E. Van Buren
Brownsville, Texas 78550
Telephone: (965) 574-0109
Facsimile: (956) 574-0227

                                                                  Katherine L. Haden
                                                                  Assistant United States Attorney