UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. B-04-015 |
| v. | § | |
| | § | |
| | § | |
| $155,895 UNITED STATES CURRENCY | § | |
| Defendant. | | |

## TRIAL BRIEF OF PLAINTIFF UNITED STATES

Respectfully submitted,

DONALD J. DeGABRIELLE, JR.
United States Attorney

KATHERINE HADEN
Assistant United States Attorney
Attorneys for Plaintiff
919 Milam Street, Suite 1500
P.O. Box 61129
Houston, Texas 77208
(713) 567-9365

## TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Trial Brief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.  Civil Forfeiture . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

II.  Civil Forfeiture of Drug Proceeds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  Discussion of Applicable Law- Evidence that Proves Currency
      Is Traceable to Unlawful Drug Transaction . . . . . . . . . . . . . . . . . . . . . . . . . 5

      A.  Claimant's Connection to Unlawful Drug Activities by Prior Arrest,
          Conviction, Forfeiture or Association with Drug Traffickers . . . . . . . . .6

      B.  Large Quantity of Cash . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      C.  Large Amounts of Cash in Smaller Denominations . . . . . . . . . . . . . . . 9

      D.  Method of Packaging . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      E.  Concealment of Currency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      F.  Method of Travel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      G.  Claimant's False, Inconsistent or Implausible Statements . . . . . . . . . . 11

      H.  Claimant's Extreme Nervousness . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      I.   Positive Dog Alert . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

      J.   Claimant's Failure to Corroborate Story . . . . . . . . . . . . . . . . . . . . . . . 13

      K.  Owner's Failure to Claim Ownership in Currency . . . . . . . . . . . . . . . . 14

i

IV. Evidence in this Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

   A. Seizure of Defendant Currency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

   B. Claimants' Inconsistent, Implausible and Evasive Statements
      Regarding Source of Defendant Currency and their Interest . . . . . . . . 20

      1. Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      2. Interrogatories . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      3. Deposition Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

   C. Prior Illegal Drug Activities Linked to Omar . . . . . . . . . . . . . . . . . . . . . .29

      1. 2002 Marijuana Seizure and Forfeiture of
         Omar's Tractor/Trailer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

      2. 1998 Arrest for Transporting 125 Pounds of Marijuana . . . . . . 31

      3. 1992 Arrest and Conviction for Possession of
         8.5 pounds of Marijuana . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

V.   Application of Law to the Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

VI.  Innocent Ownership Defense is Inapplicable . . . . . . . . . . . . . . . . . . . . . . . 36

VII.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

VIII. Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

# TABLE OF AUTHORITIES

**Cases**                                                      **Page**

*In re Ramu*, 903 F.2d 312
(5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Undetermined Amount of U.S. Currency*,
376 F.3d 260 (4th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

*United States v. $30,670.00*,
403 F.3d 448 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*United States v. $42,500.00*,
283 F.3d 977 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9,10

*United States v. $67,220.00*,
957 F.2d 280 (6th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. $83,310.78,*
851 F.2d 1231 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4,6,12

*United States v. $84,615*,
379 F.3d 496 (8th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,9,10

*United States v. $87,118.00*,
95 F.3d 511 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 10

*United States v. $99,990.00*, 69 Fed. Appx. 757,
2003 WL 21698849 * 7 (6th Cir. 2003) (unpublished) . . . . . . . . . . . . . . . 10

*United States v. $110,873.00*, 159 Fed. Appx. 649,
2005 WL 3271312 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. $117,920.00,*
  413 F.3d 826 (8th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 12

*United States v. $150,660.00,*
  908 F.2d 1200 (8th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. $159,880.00,*
  387 F.Supp.2d 1000 (S.D. Iowa 2005) . . . . . . . . . . . . . . . . . . . . . . . 5,12.,14

*United States v. $174,206.00,*
  320 F.3d 658 (6th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. $215,300.00,*
  882 F.2d 417 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. $242,484.00,*
  389 F.3d 1149 (11th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*United States v. Carrell,*
  252 F.3d 1193 (11th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Cherry,*
  330 F.3d 658 (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Dodge Caravan Grand SE/Sport Van,*
  387 F.3d 758 (8th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

*United States v. Hooper,*
  229 F.3d 818 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Knox,*
  839 F.2d 285 (6th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. One 1988 Checolet 410 Turbo Prop Aircraft,*
  282 F.Supp.2d 1379, (S.D. Fla. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. One Lot of U.S. Currency, $36,634*,
    103 F.3d 1048 (1st Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 13

*United States v. Sokolow*, 490 U.S. 1, 8-9,
    109 S.Ct. 1581 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Thomas*,
    913 F.2d 1111 (4th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*United States v. United States Currency in the Amount of $898.719.00*,
    2003 WL 21544283 *2 (W.D. Mo. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Wagoner County Real Estate*,
    278 F.3d 1091 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Via Mat International South America Ltd. v. United States*,
    446 F.3d 1258 (11th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Statutes**                                                                           **Page**

18 U.S.C. § 983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 983(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 983(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 39

18 U.S.C. § 983(d)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

18 U.S.C. § 983(d)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

18 U.S.C. § 983(d)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

21 U.S.C. § 881 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

21 U.S.C. § 881(a)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

21 U.S.C. § 881(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. B-04-015 |
| v. | § | |
| | § | |
| | § | |
| $155,895 UNITED STATES CURRENCY | § | |
| Defendant. | | |

## TRIAL BRIEF OF PLAINTIFF UNITED STATES

The United States files this trial brief, and would show as follows:

## I. Civil Forfeiture

"'A civil forfeiture action is an *in rem* proceeding brought by the

government as plaintiff against defendant property asserting that '[a]ll right, title,

and interest in the [defendant] property' has vested in 'the United States upon

commission of the act giving rise to forfeiture.'" *United States v. Dodge Caravan

Grand SE/Sport Van*, 387 F.3d 758, 760 (8th Cir. 2004)(quoting 18 U.S.C. §

981(f)).  The *in rem* action against the seized property is brought under the fiction

that the property itself is guilty of facilitating the crime. *Via Mat International

South America Ltd. v. United States*, 446 F.3d 1258, 1264 (11th Cir. 2006).

Civil forfeiture has different elements and objectives than a criminal

forfeiture.  Criminal forfeiture is an *in personam* remedy against defendants

convicted of certain offenses. The primary objective is to punish the property

owner. *United States v. Cherry*, 330 F.3d 658, 669 n. 16 (4th Cir. 2003). By

contrast, civil forfeiture is an *in rem* action against property involved in certain

offenses, not the property owner. Property that was involved in a violation to

which forfeiture attaches should be forfeited regardless whether the property

owner was criminally culpable. *Id.*

The Supplemental Rules for Certain Admiralty and Maritime Rules apply to

civil forfeiture proceedings. *In re Ramu*, 903 F.2d 312, 314 (5th Cir. 1990). The

general Rules of Civil Procedure for the United States district courts also apply to

civil forfeiture proceedings, to the extent they are not inconsistent with the

Supplemental Rules. *See* Rule A, Supplemental Rules.

## II. Civil Forfeiture of Drug Proceeds

Title 21 U.S.C. § 881(a)(6) provides that all money furnished or intended to

be furnished in exchange for a controlled substance, traceable to such an

exchange, or used or intended to be used to facilitate a controlled substance

offense is subject to forfeiture to the United States. All right or title to § 881(a)(6)

property shall vest in the United States upon commission of the act giving rise to

the forfeiture. 21 U.S.C. § 881(h). In enacting the Comprehensive Crime Control

Act of 1984, of which § 881(a)(6) is a part, Congress stated that its purpose was to

2

"to enhance the use of forfeiture . . . as a law enforcement tool in combating . . . drug trafficking. . . S. Rep. No. 225, 98th Cong.2d Sess. 191, 192, reprinted in 1984 U.S.C.C.A.N. 3182, 3374-75. *See United States v. Wagoner County Real Estate*, 278 F.3d 1091, 1096 (10th Cir. 2002).

Section 881(a)(6) is subject to the standards set forth in 18 U.S.C. § 983 (the Civil Asset Forfeiture Reform Act of 2000, "CAFRA"). Section 983(c)(1) provides that the burden of proof is on the government to establish, by a preponderance of the evidence, that a property is subject to forfeiture. *See United States v. $30,670.00*, 403 F.3d 448, 455 (7th Cir. 2005); *United States v. $84,615*, 379 F.3d 496, 501 (8th Cir. 2004). "The burden of showing something by a 'preponderance of the evidence,' . . . simply requires the trier of fact 'to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence.'" *Dodge Caravan Grand SE/Sport Van*, 387 F.3d at 760 (quoting *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 622, 113 S.Ct. 2264 (1993)). The government may use evidence gathered after the filing of the forfeiture complaint to meet its burden of proof. 18 U.S.C. § 983(c)(2). *See United States v. Undetermined Amount of U.S. Currency*, 376 F.3d 260 (4th Cir. 2004).

3

376 F.3d 260 (4th Cir. 2004).

To establish that currency is subject to forfeiture under 21 U.S.C. § 881, the United States need not produce direct evidence that the seized money is related to an illegal drug transaction. It may use circumstantial evidence to establish its burden of proof. *$30,670.00*, 403 F.3d at 469. As such, the United States does not have to link the currency to a particular identifiable narcotics transaction. It need only show that it was related to *some* illegal drug transaction. *Id.* Moreover, a § 881(a)(6) forfeiture is not conditioned upon an arrest or conviction for a drug offense, *Id*; or the presence of a controlled substance or paraphernalia along with the currency. *United States v. $83,310.78,* 851 F.2d 1231, 1236 (9th Cir. 1988).

The presence or absence of any single factor is not determinative. Evidence is to be viewed as a totality and not minutely parceled. *Id.* Although no one circumstance may be conclusive, aggregate facts can provide sufficient proof to establish that seized money is drug proceeds. *Id. See United States v. $242,484.00*, 389 F.3d 1149, 1160 (11th Cir. 2004)("[I]n evaluating the evidence of proceeds traceable to drug transactions, we have eschewed clinical detachment and endorsed a common sense view to the realities of normal life applied to the totality of the circumstances"). "A lower degree of reliability of evidence does not foreclose its use, but instead 'only makes necessary a greater amount of other

4

reliable information to establish' the required connection in drug activity." *United*

*States v. $159,880.00*, 387 F.Supp.2d 1000, 1012 (S.D. Iowa 2005)(quoting

*$242,484.00*, 389 F.3d at 1166, wherein Court of Appeals for the Eleventh Circuit

observed that the NADDIS report of arrest history should be afforded some

weight).

## III. Discussion of Applicable Law
Evidence that Proves Currency is Traceable to Unlawful Drug Transaction

Courts have recognized that the government can satisfy its burden of

proving that currency is subject to forfeiture under 21 U.S.C. § 881 by a number of

circumstantial factors.  Much of the forfeiture case law was decided before the

enactment of CAFRA in 2000 which changed the government's burden of proof

from probable cause to proof by a preponderance of the evidence.[1]  Nonetheless,

"[f]actors that weighed in favor of forfeiture in the past continue to do so

now–with the obvious caveat that the government must [now] show" a link

---

[1]Prior to the enactment of CAFRA, the government had the initial burden of establishing probable cause to believe that the property was subject to forfeiture. *United States v. $87,118.00,* 95 F.3d 511, 518 (7th Cir. 1996).  Once this burden was met, the burden then shifted to the claimant to prove by a preponderance of the evidence that the property was not subject to forfeiture. If the claimant failed to rebut the government's proof, the government's showing of probable cause alone supported a judgment of forfeiture. *Id.; United States v. $67,220.00,* 957 F.2d 280, 284 (6th Cir. 1992).  CAFRA's change in the government's burden of proof was meant to "'level [ ] the playing field between the government and persons whose property has been seized'. . . so that property could not be seized when the preponderance of the evidence showed that the property was not subject to forfeiture." *United States v. $174,206.00*, 320 F.3d 658, 662 (6th Cir. 2003). That CAFRA places the burden on the government does not change the fact that if the government meets its burden, it will prevail. *Id.*

5

between forfeited property and illegal activity under the preponderance rather than probable cause standard. *$30,670.00*, 403 F.3d at 469; *$159,880.00*, 387 F.Supp.2d at 1012 ("The same factors analyzed under the probable cause standard are relevant to the preponderance-of-the-evidence determination").

A. **Claimant's Connection to Unlawful Drug Activities by Prior Arrest, Conviction, Forfeiture or Association with Drug Traffickers**

Testimony that a claimant was previously implicated in other unlawful drug-related activities is highly probative evidence in a Section 881(a)(6) forfeiture proceeding. *See $242,484.00*, 389 F.3d at 1166 (Indication by DEA's Narcotics and Dangerous Drug Information System "NADDIS" that claimant's business was possibly utilized for money laundering was probative evidence. Although the court recognized that a NADDIS report had a lower degree of reliability than other types of evidence, that fact did not foreclose its use); *United States v. Carrell*, 252 F.3d 1193, 1201 (11th Cir. 2001)(Evidence that claimants were generally engaged in drug business over a period of time or had a history of drug violations was probative evidence in a civil forfeiture proceeding); *$22,474.00*, 246 F.3d at 1217 (Evidence of prior conviction for cocaine trafficking linked incriminating circumstances to illegal drugs); *$67,220.00,* 957 F.2d at 286 (Claimant's record of drug activity is a highly probative factor in the forfeiture

6

calculus); *$83,310.78*, 851 F.2d at 1235 (Money carrier's arrest and conviction record is probative); *United States v. $898.719.00*, 2003 WL 21544283 *2 (W.D. Mo. 2003)(Evidence showed that claimant was implicated in the seizure of 2100 pounds of marijuana 1½ months before the seizure of defendant currency). *Cf $215,300*, 882 F.2d at 419 (NADDIS report of a charge that had been dismissed, without any other evidence of prior drug activity, was not credible indicia of current illegal activity).

In assessing whether evidence links currency to unlawful drug activities, the court is not limited to considering only prior convictions of a claimant. "The fact that an individual was *arrested* for possession of illegal drugs is probative evidence since it is only the probability of a connection between criminal conduct and the property to be forfeited that the government must establish." *United States v. Thomas*, 913 F.2d 1111, 1115 (4th Cir. 1990)(In civil forfeiture bench trial, evidence showing Thomas had a history of drug-related arrests and convictions, and that he was implicated in undercover buys at the business he owned and operated, was probative evidence linking seized currency to drug activities) (emphasis added).

Likewise, testimony that the claimant was present during prior drug transactions, or associated with known drug traffickers, is probative evidence

7

when combined with other evidence. *United States v. One Lot of U.S. Currency, $36,634*, 103 F.3d 1048, 1055 (1st Cir. 1997)(Court observed that claimant's association with two known drug traffickers, combined with other factors, supported probable cause for forfeiture); *Thomas*, 913 F.2d at 1116-117 (District court erred in failing to accord any weight to the agent's testimony that Thomas was present during undercover drug purchases). Evidence of a claimant's prior association with drug activity is both probative and relevant since circumstantial evidence of drug transactions is sufficient to support the burden of proof in forfeiture proceedings, and it is not necessary to show a direct connection between the property subject to forfeiture and the illegal activity that renders the items forfeitable. *Id.* at 1117.

Similarly, evidence that other property has been seized and/or forfeited from the claimant as drug-related is circumstantial evidence that the defendant currency is also drug-related. *See United States v. $110,873.00*, 159 Fed. Appx. 649, 2005 WL 3271312 (6th Cir. 2005)(Court held government satisfied its burden by a combination of factors, including evidence that currency was previously seized from claimant after a dog detected the odor of drugs).

## B. **Large Quantity of Cash**

The possession of a large quantity of cash is significant proof that the

8

currency is drug proceeds. *See United States v. $117,920.00,* 413 F.3d 826, 829

(8th Cir. 2005)(Possession of large amount of cash is "strong evidence");

*$242,484.00*, 389 F.3d at 1161 ("A common sense reality of everyday life is that

legitimate businesses do not transport large quantities of cash . . . because it is

highly risky. . . Legitimate businesses wire cash between bank accounts or they

convert large amounts of cash into cashier's checks." Those who deal in unlawful

drug proceeds want to avoid wiring large sums of money because it generates a

currency  transaction report); *$84,615,* 379 F.3d at 501-02 (Possession of large

amount of cash is strong evidence that it was connected to drug activity); *United

States v. $42,500.00*, 283 F.3d 977, 981 (9th Cir. 2002)("We have previously held

that possession of a large amount of cash 'is strong evidence that the money was

furnished or intended to be furnished in return for drugs'").

### C. Large Amounts of Currency in Smaller Denominations

Transporting large amounts of money in smaller denominations is indicative

of drug trafficking. *See $242,484.00*, 389 F.3d at 1161 (Even if there were some

legitimate reason for transporting such a large amount of cash, the bulk and weight

of the money could have been reduced substantially by taking it to a bank and

having the smaller denomination bills converted into $100 bills. "Of course, those

who deal in drug-tainted money cannot avail themselves of such conveniences,

9

because having a bank convert" a large amount of bills of multiple denomination would generate a currency transaction report); *United States v. $87,118.00*, 95 F.3d at 519-20; *$159,880.00*, 387 F.Supp.2d at 1013.

## D. Method of Packaging

The method of packaging currency is probative proof of drug-related activity. Courts have held that storing currency in vacuum-sealed bags is a common ploy used by drug-traffickers to mask odors that might be detected by a dog search. *See $84,615*, 379 F.3d at 501 (Transporting the bulk of money in vacuum-sealed bags is a common ploy to mask odors that might be detected by dog searches); *United States v. $99,990.00 in United States Currency*, 69 Fed. Appx. 757, 2003 WL 21698849 * 7 (6th Cir. 2003) (unpublished) (Currency packaged in heat-sealed and taped wrapping is indicative of illegal drug activity). *See generally*, *$42,500.00*, 283 F.3d at 982 ("Unlike a purse or money pouch, cellophane is not a normal repository for carrying large amounts of cash").

## E. Concealment of Currency

The concealment of a large amount of money is probative proof that the currency is drug proceeds. *See $242,484.00*, 389 F.3d at 1162 (Court found that concealing cash in Christmas bag or wrapping during holiday season was consistent with the way drug rings send their illicit proceeds by couriers); *United*

10

*States v. $215,300 United States Currency*, 882 F.2d 417, 418-19 (9th Cir. 1989)

(Evidence that the claimant concealed the money in his socks and an apron-like

cloth taped to his waist supported the inference that the money was drug-related).

## F. **Method of Travel**

The method of travel can also link currency to drug-trafficking activity. *See*

*$242,484.00*, 389 F.3d at 1163 (Recognized that drug couriers often travel on

tickets purchased with cash); *United States v. $150,660.00*, 908 F.2d 1200, 1206

(8th Cir. 1993)(Purchase of one-way train ticket with cash was a probative factor in

favor of forfeiture); *United States v. Knox*, 839 F.2d 285, 290 (6th Cir.

1988)(Purchased ticket with cash the day before to travel from source city). *See*

*generally United States v. Sokolow*, 490 U.S. 1, 8-9, 109 S.Ct. 1581, 1586

(1989)("Most business travelers, we feel confident, purchase airline tickets by

credit card or check so as to have a record for tax or business purposes, a few

vacationers carry with them thousands of dollars in $20 bills").

## G. **Claimant's False, Inconsistent, or Implausible Statements**

Evidence that the claimant provided false, inconsistent, or implausible

statements about events surrounding possession of the currency is another

circumstance that shows the currency is drug proceeds. *See $117,920.00*, 413

F.3d at 829 (Claimant denied having a large amount of currency); *$30,670.00*, 403

11

F.3d at 467 (Claimant gave false explanations regarding travel to Phoenix, reason

for carrying large amount of money and source of funds); *$242,484.00*, 389 F.3d

at 1163-64 (Claimant's evasive and conflicting stories about trip to New York was

significant evidence in support of the government's case. A person who tells the

truth normally does not have any difficulty keeping her story straight about the

purpose of a trip she just completed); *$22,474,00*, 246 F.3d at 1217 (Conflicting

and implausible statements regarding the origin of the money, claimant's reasons

for visiting Phoenix, his last job, the address of the person he claimed to be

visiting, was probative evidence that the money was drug-related); *$67,220.00,*

957 F.2d at 286 (Claimant's inconsistent statements about the amount of money he

carried, and the source of the money, were probative evidence of criminal

activity); *$83,310.78*, 851 F.2d at 1236 (Claimants first denied owning the seized

currency); *$159,880.00*, 387 F.Supp.2d at 1013-16 (Claimant's false

representation that he did not carry a large amount of money undermined the

credibility of his assertions of legitimate reasons for possessing the money).

## H. Claimant's Extreme Nervousness

Evidence that the claimant was extremely nervous when encountering law

enforcement officers is probative proof that the currency is drug proceeds. *See*

*$30,670.00*, 403 F.3d at 468 (Claimant's nervous behavior was suspicious);

12

*$36,634*, 103 F.3d at 1055 (Claimant's nervousness during interview with agents had probative value when seen in combination with other factors); *$215,300 U.S. Currency*, 882 F.2d at 419 (same).

## I. Positive Dog Alert

A positive dog alert to the odor of a controlled substance on the currency is probative proof that the currency is drug proceeds. While there is case law influenced by pseudo-science tendered by the criminal defense, more recent and careful analysis supports what both law enforcement and criminals know to be true - that canines trained to detect the odors of illegal drugs are highly effective. *See $30,670.00*, 403 F.3d at 455-65 (Provides an extensive discussion and a list of authority and recent published articles). *See also $242,484.00*, 389 F.3d at 1166; *$42,500.00*, 283 F.3d at 982.

## J. Claimant's Failure to Corroborate Story

Another probative factor is the claimant's failure to provide any documentary proof to corroborate his account regarding the source of the money, purpose and places of travel. *See Funds in the Amount of $30,670.00*, 403 F.3d at 466 (Court could draw inferences and grant summary judgment from claimant's failure to substantiate the source of the currency or a sufficient legitimate income); *$242,484.00*, 389 F.3d at 1164 (There was a total lack of documentation to support

13

claimant's story. She did not produce for the agents one piece of paper supporting her story, such as receipts or business documentation, to show the money was connected to a business); *$159,880.00*, 387 F.Supp.2d at 1015 (Claimants provided no proof to support their contention that they were looking for a business to purchase).

### K. **Owner's Failure to Claim Ownership to Currency**

A circumstance which weighs in favor of the government is when the alleged owner of the seized currency does not come forward to claim the money after it is seized. *See $242,484.00*, 389 F.3d at 1167 (The person from whom the money was seized claimed she possessed the money for a business named Mike's Import and Export. Yet, the business never came forward to claim the money).

### IV. Evidence in this Case

### A. **Seizure of Defendant Currency**

On August 4, 2003, Harlingen police officers performed a routine bus interdiction at US 77 Frontage Road and Tyler Avenue in Harlingen, Texas. Harlingen Police Officer Ramiro Martinez encountered Claimant Omar Martinez as he collected baggage (one suitcase and two plastic bags with boxes inside). They engaged in a routine and consensual conversation regarding where Omar had traveled, the purpose and length of the trip, and so forth. Omar claimed he

14

traveled from Virginia where he had been working. He reportedly stayed there for three weeks. Officer Martinez noticed Omar was more nervous than the ordinary passenger. Omar avoided eye contact, kept putting his hands inside his pockets, and paced back and forth. Office Martinez asked if Omar carried any weapons or drugs. Omar immediately answered "no" and invited Officer Martinez to search him or his bags. Officer Martinez next asked if Omar carried a large amount of currency. Omar grabbed a bulge in his pocket and stated he had about $1800, but denied carrying more than $2000.

Officer Martinez confirmed that Omar consented to a search of his suitcase. He looked inside the suitcase, finding two cell phones and a receipt for the recent purchase of a cell phone. Omar walked away during the search and when he returned, the bus driver asked if a DVD player inside a shopping bag belonged to him. Omar answered affirmatively and placed it next to another shopping bag containing a Karaoke machine. Officer Martinez asked Omar if the Karaoke machine also belonged to him, at which time, Omar's hands began to shake and he began to breathe rapidly. Omar answered, yes, that he had purchased it for his son. Although Officer Martinez noticed that the factory tape on top of the store box had been cut, Omar stated that he had never opened the box. Omar gave Officer Martinez permission to open the box and inspect the Karaoke machine.

15

When Officer Martinez removed the Karaoke player from the box, he noticed it was heavier than expected. On further inspection he saw, in plain view through holes on the back board of the Karaoke machine, bundles of United States currency. Meanwhile, Omar was walking away carrying his suitcase and the other shopping bag. Officer Martinez called Omar back and asked him about the money. Omar was silent for a moment, and then claimed he knew nothing about the money.

Omar permitted Harlingen police officers to open the back of the Karaoke player, but requested they do it outside the view of other bus passengers. He also acknowledged that there was more money hidden inside the DVD player and gave the officers permission to open the frame of the DVD player as well. Officers ultimately discovered several bundles of United States currency, packaged in clear plastic vacuum-sealed bags, inside both the Karaoke machine and DVD player. The currency was packaged the same way that drug traffickers package their narcotics to prevent detection from law enforcement. The officers reassembled the two items and placed them back in their boxes without removing the currency.

Officer Martinez spoke with Omar's wife, Mayra Martinez, who had arrived to pick up Omar. Mayra stated she did not know where Omar had traveled and that "he just told me to pick him up here." When told about the currency, Mayra

16

appeared surprised. She stated that she did not know Omar carried a large amount

of cash, and added that he had just lost his job a month earlier and went

somewhere to look for a job.

Officer Martinez returned to Omar and asked whether the money belonged

to him. Omar answered in Spanish that the money was found in his bags, so it

belonged to him. Omar stated that he got the money from work. Officer Martinez

asked how much money Omar was carrying and Omar responded "let's count it."

Officer Martinez told Omar that he was not under arrest and was free to go, but

that the officers needed to further investigate the money. Officer Martinez invited

Omar to come to the police office if he wished.

Officer Martinez transported the evidence, while Omar rode in an unmarked

car with Harlingen Police Officer Jose Garcia and Investigator Leo Silva to the

HPD, Special Investigations Unit (SIU). During the drive, Omar disclosed that he

was carrying about $100,000.00, or a little more. He changed his earlier account

about the source of the money, stating the money came from a lawsuit that he had

won. He again stated he had traveled from Virginia.

At the SIU, Investigator Silva began completing a personal history sheet on

Omar. When Omar pulled out identification from his wallet, Investigator Silva

noticed that the wallet contained a large amount of cash. He subsequently

17

recovered $1945 from Omar's wallet, and the following: (1) a $105.99 receipt for the purchase of a DVD player dated 8/2/03 from Sears Store in King of Prussia, Pennsylvania; (2) a receipt from the Motel 6 in King of Prussia, dated 7/28/03 to 7/29/03 under the name of Victoriano Anzualda with a Florida driver's license number; and (3) a hand-written note with the name Frank Rouco and two other names, a Philadelphia address and phone numbers, and directions to a warehouse.

After Officer Martinez arrived at the SIU, he utilized his dog, Kai, to conduct a dog sniff of the recovered items. Kai was trained and certified to detect the odor of cocaine, marijuana, heroin and methamphetamine. Kai alerted to the odor of a controlled substance on or inside the boxes containing the Karaoke machine and DVD player, as well as, the suitcase. Kai also subsequently alerted to the odor of a controlled substance on the $1945.00 currency recovered from Omar.

Officers Martinez and Garcia spoke with Mayra at the SIU. She disclosed that Omar had recovered about $129,000 from a wrongful death lawsuit several years earlier. She reported that Omar paid off a house and purchased a tractor-trailer with the money he received. She reported their average savings account balance was $5000 and that Omar was a truck driver who had stopped working a month earlier. She stated she had quit working after the birth of their baby.

18

Officer Garcia asked Mayra if she knew about the $100,000 or more that Omar reportedly carried or where he got it from. Mayra maintained that she knew nothing about the money.

Officer Martinez learned from El Paso Intelligence Center "EPIC" records that on 4/29/98, Omar was arrested at the Sarita checkpoint for possession of 125 pounds of marijuana. The Drug Enforcement Administration (DEA) also had an open investigation of Omar involving the seizure of 1000 pounds of marijuana from a tractor-trailer he owned.[2]

Officers recovered, counted, and seized seven bundles of currency from the Karaoke machine, three bundles from the DVD player, and $1945 from Omar's person. The denominations, totaling $155,895.00, consisted of:

5 of $1's = $5.00
4 of $5's = $20.00
2 of $10's = $20.00
1000 of $20's = $20,000.00
579 of $50's = $28,950.00
1069 of $100's = $106,900.00
Total = $155,895.00

The officer believed that the above facts and circumstances established probable cause to believe that the Defendant Currency was used, acquired, or exchanged in

---

[2]This is the same matter discussed below regarding the 2002 seizure of 910 pounds of marijuana from a tractor-trailer owned by Omar, resulting in forfeiture of the vehicle.

19

violation of the Controlled Substances Act.

## B. Claimants' Inconsistent, Implausible and Evasive Statements Regarding Source of Defendant Currency and their Interest

### 1. *Claims*

In Omar's initial pleadings entitled "Statement of Right of Interest" and "Statement of Persons and Entities Known to Have a Financial Interest in this Litigation", Omar represented he is **the** bona fide owner of the Defendant Currency. He had no knowledge of any parties (other than himself) with a financial interest in this litigation.

Several months later, after the government moved to strike Omar's Statement of Interest for lack of verification, he filed amended pleadings claiming, for the first time, that he is **a** bona fide owner of the Defendant Currency, and that his siblings and father (Esteban Martinez, Jr., Julissa Trevino, and Esteban Martinez Sr.) also have a financial interest in this litigation. The above individuals subsequently entered as claimants in this action after several additional months passed.

### 2. *Interrogatories*

In his answers to the United States' interrogatories, Omar claimed that $177,600 was seized rather than $155,895, and that he had an ownership interest

20

in the entire amount. He provided a sworn statement, inconsistent with his earlier

statements to police, regarding the source of the Defendant Currency, the purpose

of his trip, and where he traveled. Omar stated his father, Esteban Martinez Sr.,

gave him $15,000 in Mercedes, Texas, between November and December 2002;

his sister Julissa Trevino gave him $20,000 in Southbay, Florida, in late December

2002; and his brother Esteban Martinez Jr. gave him $76,300 in Bridgeton, New

Jersey, on July 31, 2003. They each gave him the money for a business purchase.

Omar did not provide an explanation about the source of the remaining currency in

his interrogatory responses.

Omar further stated in responses to interrogatories that he carried the

Defendant Currency for the purpose of "obtaining or opening up a business."

Contrary to his statement to police that he traveled to Virginia to work for three

weeks, he stated: he traveled from his home in Mercedes, Texas, to Houston,

Texas, where he purchased an airplane ticket with cash and flew to Baltimore,

Maryland. From Baltimore, he said he took a train to Philadelphia where Esteban

Martinez Jr. (his brother and Claimant in this action) picked him up. They

traveled to Fairton, New Jersey, where they inquired into a business. Virginia was

not mentioned as a place where Omar traveled.

Although police officers found on Omar's person a King of Prussia Motel 6

21

receipt in the name of "Victoriano Anzualda", and a paper bearing the handwritten name of "Frank Rouco"[3] and other names, an address, phone numbers and directions to a warehouse, Omar stated in his interrogatory responses that he did not know either Anzualda or Rouco.

Omar acknowledged in his interrogatory responses that sometime in 2003 his tractor-trailer was seized for carrying contraband. However, he declared that the tractor-trailer was returned because he was an innocent owner. This statement is contradicted by a Declaration of Forfeiture provided by DEA Asset Forfeiture Counsel which verifies that both a 1996 Kenworth Tractor and 1994 Utility Trailer, owned by Omar Martinez, were seized from Ricardo Guajardo in May 2002, and administratively forfeited on February 3, 2003, and October 17, 2002, respectively.

3. *Deposition Testimony*

All of the claimants were deposed. Esteban Martinez Jr., Julissa Trevino and Esteban Martinez Sr. claimed they owned $76,300; $20,000; and $15,000, respectively. They all claimed the source of their portion of the Defendant

---

[3]The handwritten address on the piece of paper is that of Quality Penn Products, a pallet recycling company, located at 1746 N. Front. St. Philadelphia, Pa. 19122. Frank Rouco is the owner. Rouco was previously convicted for cocaine trafficking in Dade County, Florida, and sentenced to an imprisonment term of 3 ½ years on February 3, 1989.

22

Currency came from a check for $129,454 they received from a legal settlement in August 2000.[4] None of them could produce banking information that actually linked the Defendant Currency to the funds from the settlement check.

Trevino testified that after receiving the legal settlement check in August 2000, she purchased certificates of deposit (CDs) with part of the check amount. She later withdrew four of the certificates of deposit. She provided copies of incomplete bank records showing four CDs, each for $5000, were withdrawn in November 2000, subject to an early penalty and withdrawal fee. The records did not show that the CDs were purchased with funds derived from the legal settlement check. Trevino testified that the money she withdrew remained in her house until she loaned $20,000 to Omar two years later in late December 2002. Trevino testified she lent the $20,000 to Omar without any questions asked. He simply told her it was for a business. Nothing was discussed as to how or when he would pay her back. Trevino further testified that she did not think $20,000 was a lot of money. Tax records reflect that the income for Trevino's household (comprised of Trevino, her husband, four children and two nieces) did not exceed

---

[4]The claimants and other family members brought a wrongful death action in connection with the death of Manuela Martinez, the wife of claimant Esteban Martinez Sr. and mother of claimants Omar Martinez, Esteban Martinez Jr., and Julissa Trevino. On August 18, 2000, a legal settlement was reached and the claimants each received $129,454.74 as their share of the settlement.

23

$40,000.00 for tax years 2000 through 2003; and the Trevinos received an earned income tax credit and tax refund for the above years.

Esteban Martinez Jr. also testified that his portion of Defendant Currency came from his legal settlement check. He said he deposited the above amount into an account at Bank of Belle Glade and later withdrew money. He could not recall when he withdrew the money, or for how much. He referenced some papers he provided his attorney. The referenced papers were copies of incomplete bank records reflecting that Esteban Jr. and his wife opened a CD in the amount of $100,000 at Bank of Belle Glade on February 8, 2001, withdrew it in June 2001, and thereafter, kept it in his house. Again the records did not link the CD to funds from a legal settlement check.

Esteban Jr. testified that he kept all of the Defendant Currency for several months. In late December 2002, Omar visited him in Southbay, Florida, and they discussed purchasing a business together. Esteban had his $76,300 and Omar gave him the remainder of the Defendant Currency. Esteban Jr. testified that all the currency stayed in his house until he brought it to Fairton, New Jersey, during a family trip that following summer. He looked at one property in Fairton as a prospect for opening a store or restaurant. He could not recall the address of the property, the name of the man he spoke to about the property, or the date it

24

occurred. Nor did he ever discuss a purchase price for the property.

Esteban Jr. testified that during his stay in New Jersey he met Omar in Philadelphia. They looked for potential business properties in Philadelphia. Esteban Jr. could not recall where they looked. They just drove around. They never spoke to any individuals. They next looked for properties in New Jersey, with no results. They decided against purchasing the property he had looked at in Fairton. They subsequently looked at properties in Raleigh, North Carolina. He could not recall talking with anyone there either. Esteban Jr. testified that when they found no suitable properties, they agreed Omar would take the money back to south Texas and look for a business to purchase there. Omar took a bus back to Texas, and Esteban Jr. drove back to Florida with his family.

According to tax records, the total income for Esteban Jr.'s household (including wife and two children) did not exceed $25,000 during the tax years 2000 through 2003. The household received a tax refund for each of the above tax years and an earned income tax credit for tax years 2001 through 2003.

Esteban Martinez Sr. testified during depositions that he lived off of his monthly social security checks for $440. He testified that he lent $15,000, which was part of an amount he received in a legal settlement, to Omar in November or December 2002. He deposited the settlement check into a bank but later withdrew

25

part of the money and stored it in his house. He could not recall when he deposited the settlement check, or when he withdrew the amount representing the $15,000 from his account. Omar asked to borrow the $15,000 to open a business. He did not ask for any further details or discuss repayment. Esteban Sr. testified that he knew nothing about the arrests and convictions of his sons Omar and Martin Martinez for drug-related offenses.

Omar Martinez testified at depositions that he had an ownership interest in $66,300.00 of the Defendant Currency–rather than $177,600 as he stated in response to interrogatories. According to joint tax returns for Omar and Mayra Martinez, the Martinez's had an adjusted gross income of below $19,000.00, for the tax years 2000-2003. Omar acknowledged during his deposition that there were several discrepancies between the information he and his wife reported in tax returns and the information he provided in response to interrogatories. He could not explain some of the information reported on the tax returns.

With regard to his purported trip to New Jersey, Omar testified that he purchased a one-way ticket to Baltimore, Maryland, with cash shortly before the departure. He then took a train to Philadelphia where his brother picked him up. He did not inquire whether flights or trains went to New Jersey. They next rode around the streets of Philadelphia looking for a potential site for a Mexican store

26

or restaurant, without the assistance of a real estate agent, or any apparent listings. Omar could not recall any particular properties they viewed, or whether they spoke to any individuals. They subsequently stayed at Esteban Jr.'s mobile home in New Jersey for a few days. Omar testified Esteban Jr. spoke to an agent about a property in Fairton, but he never did. They looked at property in Fairton, New Jersey, and Raleigh, North Carolina, and nothing looked suitable. Omar could not recall any specific property that they visited in Raleigh. They agreed Omar would return to south Texas with the currency and search for a business there. Omar testified that he placed the money in vacuum-sealed bags to compress it, and that he concealed the money in a Karaoke machine and DVD player to avoid theft.

Omar testified that the Motel 6 receipt found in his wallet did not belong to him. He did not recall having the receipt. The receipt reflected that on July 28, 2003, an individual named Victoriano Anzualdo rented a room at the Motel 6 in King of Prussia, Pennsylvania. Omar also did not recall writing names and directions on a piece of paper found in his wallet. While he identified his handwriting on the paper, he did not recognize the names and did not recall how he received directions to a warehouse in Philadelphia.

Omar testified that he did not recall telling Harlingen police officers that he had been working in Virginia. He did not disclose to police that some of the

27

Defendant Currency belonged to family members. He "didn't want to get into all that with them." He also did not recall whether he told police that he planned to use the money to purchase a business. Omar testified that he did not tell his wife about the purpose of his trip. He had little contact with her during the trip.

During his deposition, Omar acknowledged pleading guilty to possession of 8 ½ pounds of marijuana in 1992. However, he claimed his brother was the one who committed the offense and that he just happened to be there. When asked whether he recalled driving to another location to retrieve marijuana and subsequently delivering it to an undercover police officer, Omar testified "I don't recall the details for that" since it was a long time ago. Omar later testified that he believed that his brother picked up another individual who had the marijuana, but that he could be wrong. When asked whether he denied having any involvement with the marijuana, Omar replied "I got charged with it so. . ." He testified that he pled guilty at the advise of his attorney.

With regard to his 1998 arrest, Omar testified that he knew nothing about 125 pounds of marijuana that was concealed in the sleeper compartment of a tractor-trailer he drove.  As to the 2002 seizure of his tractor-trailer for transporting 910 pounds of marijuana, Omar could not recall much. He admitted having telephone contact with the driver, Ricardo Guajardo, prior to the seizure.

28

However, contrary to tape-recorded conversations and phone records, Omar

denied telling Guajardo to contact "El Flaco" or "Mayo" upon his arrival in

Atlanta, and he denied calling any individuals in Atlanta before the marijuana

bust.

## C. **Prior Illegal Drug Activities Linked to Omar**

1. *2002 Marijuana Seizure and Forfeiture of Omar's Tractor and Trailer*

On May 20, 2002, Louisiana State Patrol Troopers arrested Ricardo

Guajardo for transporting 910 pounds of marijuana, valued at close to $1 million.

The marijuana was concealed within a load of watermelons that were purportedly

to be delivered by O&A Transport. Authorities determined that Omar Martinez

owned the tractor-trailer and also obtained information from Guajardo and other

sources indicating that Omar hired Guajardo to transport the marijuana load.

Guajardo ultimately agreed to complete the delivery of the marijuana to

persons in Atlanta, Georgia, with the assistance of law enforcement. He was

waiting for Omar to give him the name and phone number of the contact person in

Atlanta who would tell him where to deliver the marijuana.

A DEA agent accompanied Guajardo to Atlanta in Omar's tractor-trailer.

Guajardo telephonically communicated with Omar several times on the way.

Their conversations were recorded. Omar instructed Guajardo to drive slowly and

29

to call him two hours before reaching Atlanta to obtain the name of the contact person. When Guajardo made the call, Omar instructed him to wait until the next morning to deliver the load. Guajardo asked whether it might look suspicious in the morning and Omar answered that it would not be a problem.

The next morning, Omar gave Guajardo a phone number and contact name of "El Flaco." When Guajardo called the phone number, an unidentified man answered and said he would call Guajardo back. Guajardo next received a phone call from a person named "Javier" and they discussed Guajardo's location. Soon afterwards, Omar notified Guajardo that the contact person was "Mayo" not "El Flaco", and to call "Mayo" to put him at ease. Omar asked if "Javier" had called, and Guajardo said yes. Guajardo questioned whether he was still supposed to deliver the load to the same location, and Omar answered that he did not know, but to call "Javier" to find out. Guajardo called Javier and they agreed to meet at Shoney's in 20 minutes. Later, someone in a red Expedition arrived at Shoney's and led Guajardo to a warehouse. DEA agents subsequently arrested several individuals at the warehouse. Phone records reflect that calls were made between Omar and two Atlanta individuals implicated in the marijuana delivery.

At the time of the above events, Omar operated a trucking business called "O&A Transport." Omar listed Guajardo as an employee of "O&A Transport".

30

Omar reported in tax returns that "O&A Transport" was a partnership between him and his brother Armando Martinez. Armando Martinez was previously convicted for attempted possession of cocaine in the 15th Judicial Circuit Court for Palm Beach County, Florida, on July 20, 1995.

### 2. 1998 Arrest for Transporting 125 Pounds of Marijuana

Omar was arrested with his brother-in-law, Edgar Galvan, in Kingsville, Texas, on April 29, 1998, for transporting 125 pounds of marijuana. Omar drove a tractor-trailer bearing the logo "Valley Trucking," through the Sarita checkpoint, while Galvan rode in the tractor's sleeper compartment. Both Omar and Galvan reported they worked for Valley Trucking. A drug-detection canine alerted to the presence of a controlled substance in the sleeper compartment. Border Patrol Agents discovered three large bundles of marijuana wrapped in dryer sheets and clear plastic underneath the sleeper bed.

Omar and Edgar Galvan were indicted for possession of more than 50 pounds of marijuana in the 105th Judicial District of Kleberg County, Texas. Galvan pled guilty to the charge and was sentenced to 10 years deferred adjudication and a $4000 fine. The charge against Omar was dismissed upon the state prosecutor's motion stating that Galvan pled guilty and accepted full responsibility for the offense. Galvan was subsequently employed as a driver for

31

O & A Transport in 2001 and 2002.

### 3. *1992 Arrest and Conviction for Possession of 8 ½ Pounds of Marijuana*

On or about November 19, 1992, Fort Pierce Police Sergeant Tony Hurtado purchased about 8 ½ pounds of marijuana from Omar and his brother Martin Martinez, while working undercover in South Bay, Florida. Omar was subsequently indicted in the 15th Circuit Court, Palm Beach County. He pled guilty to possession of over 20 grams of marijuana, and was sentenced to 1 ½ years deferred adjudication probation. Shortly after this forfeiture action was filed, Omar moved the Florida court to seal the record of his 1992 arrest.

## V. Application of Law to the Evidence

All of the circumstantial factors, outlined in the legal discussion, are present in this case. First, the currency was seized from a claimant who is implicated in prior unlawful drug activities in many ways. Omar was arrested and convicted in 1992 for possession of marijuana after he and his brother, Martin Martinez, delivered marijuana to an undercover police officer. He was arrested in 1998 with his brother-in-law, Edgar Galvan, for transporting 125 pounds of marijuana in a tractor-trailer while purportedly working for Valley Trucking. In 2002, a year before the instant seizure, Omar's tractor-trailer was seized in Atlanta for transporting 910 pounds of marijuana. Omar telephonically gave instructions to

32

Ricardo Guajardo, the driver of his tractor-trailer, as to when, how and who to contact once he arrived in Atlanta. Records show that Omar and individuals arrested in Atlanta telephonically communicated as well.

Moreover, Omar employed, or affiliated with, known drug violators in the course of conducting his trucking business, O&A Transport. O&A Transport consisted of a partnership between Omar and his brother Armando Martinez. Armando had a previous conviction for attempted possession of cocaine in Florida in 1995. Omar also employed Edgar Galvan to work for O&A Transport, the person who was convicted in 1998 for transporting 125 pounds of marijuana while accompanying Omar in a tractor-trailer. Also, Guajardo was purportedly transporting a load of watermelons for O&A Transport when he was arrested in 2002 for transporting marijuana in Omar's tractor-trailer. The marijuana was concealed within the load of watermelons.

Second, in the instant case, Omar was carrying a large amount of cash in smaller denominations of twenties and fifties. He admittedly traveled with such a large amount of cash without any specific plans or preparation for what he would do with the money. He traveled with it across the country when he could have easily used a safer and more secure method of making funds available, like wiring the money or obtaining a cashier's check. A person engaging in a legitimate

33

business transaction would wire transfer the money to the far away location, or at least would have reduced the number of bills he carried by simply exchanging the smaller bills for larger denominations, thereby reducing the number of bundles and bills being transported.

Third, Omar packaged the Defendant Currency in vacuum-sealed plastic bags, which is a common ploy used by drug traffickers for packaging currency and drugs to avoid detection by law enforcement. The fact that Omar went to great lengths to purchase costly items (a Karaoke machine and DVD player) to use for concealing the currency also supports the inference that the currency was drug proceeds.

Fourth, Omar's method of travel was also indicative of drug-trafficking activity. He purchased a one-way airplane ticket with cash shortly before he traveled. Although his purported destination was New Jersey, Omar did not inquire whether there were flights or train routes to New Jersey. Instead, he testified he flew to Baltimore, took a train to Philadelphia, and subsequently drove to New Jersey. Rather than return to Texas by airplane, Omar traveled by bus, thereby avoiding the airport security device that is used to screen baggage.

Fifth, Omar displayed behavioral characteristics such as nervousness, physical shaking, lack of eye contact, and pacing back and forth when he

34

encountered police. Omar also provided false, inconsistent and implausible statements regarding the amount of currency he carried, his knowledge and ownership of the Defendant Currency, where he traveled, the reason for his trip, and the source of the Defendant Currency.

Statements by Omar's wife cast further doubt on his credibility (whether you consider the statements he made to police or the statements he subsequently made concerning the source of the money and purpose of his trip). Mayra told police she knew nothing about the money and appeared surprised he was carrying such a large amount of currency. She reported Omar already spent the money he received from a judicial settlement years earlier to pay off a house and truck. Omar was unemployed and had no known significant savings or other sources of legitimate income.

Sixth, a narcotics detection dog trained and certified to detect the odor of narcotics and controlled substances, positively alerted to the odor of narcotics on the items carrying the Defendant Currency.

Seventh, Claimants Omar and Esteban Jr. have provided little to no evidence to corroborate their contention that they were looking for a business to purchase. They could not recall any particular properties they viewed, other than one Esteban Jr. allegedly viewed in Fairton, New Jersey. However, he could not

35

recall the person he spoke to or any other details. The Claimants also did not

provide records to establish that their portion of Defendant Currency actually

came from an amount they received from a legal settlement. They merely provided

incomplete bank records that were not linked to a deposit of their legal settlement

check and claimed they withdrew cash and stored it in their houses.

Lastly, the Claimants (other than Omar) failed to claim any ownership to the

Defendant Currency until long after this action was filed. Omar initially declared

he was the only person with an interest in the Defendant Currency, but later

changed his position by stating the other Claimants also have an interest in

Defendant Currency. Omar's co-Claimants have also provided implausible,

evasive or misleading  statements concerning their banking information and the

source of the Defendant Currency.

## VI. Innocent Owner Defense is Inapplicable

The Claimants have alleged an innocent owner defense. Once the United

States meets its burden of proving by a preponderance of the evidence that the

Defendant Currency is subject to forfeiture under § 881(a)(6), to overcome

forfeiture, the claimants bear the burden of proving by a preponderance of the

evidence, that they are an innocent owner, as defined in 18 U.S.C. § 983(d). The

term "owner" means a person with an ownership interest in the specific property

36

sought to be forfeited, and does not include a person with only a general unsecured interest in, or claim against, the property of another; or a nominee who exercises no dominion or control over the property. 18 U.S.C. § 983(d)(6).

The innocent owner's defense is triggered in two ways: when someone claims he had an interest in property at the time the conduct giving rise to forfeiture occurred; and when someone claims he has an interest in property that was acquired after the conduct giving rise to forfeiture occurred. *Id.* When a claimant alleges he had an ownership interest in the property at the time the illegal conduct giving rise to forfeiture occurred, he must establish: (1) that he did not know of the conduct giving rise to the forfeiture; or (2) upon learning of the conduct, he did all that could reasonably be expected under the circumstances to terminate such use of the property. 18 U.S.C. § 983(d)(2)(A). The above situation usually occurs when a particular piece of property (i.e. house or car) was used to facilitate a crime without the participation of the property owner. *See United States v. One 1988 Checolet 410 Turbo Prop Aircraft*, 282 F.Supp.2d 1379, 1381-85 (S.D. Fla. 2003)(good discussion of innocent ownership defense).

When a claimant alleges he acquired a property interest after the conduct giving rise to forfeiture occurred, the person must establish he is a bona fide purchaser or seller of goods or services for value and did not know and was

37

reasonably without cause to believe the property was subject to forfeiture. 18
U.S.C. § 983(d)(3). In either instance, the innocent owner defense assumes that the
illegal conduct giving rise to forfeiture occurred.

A person can never assert an interest as a pre-existing owner in criminal
proceeds since the United States has an inchoate interest in currency at the
moment it becomes criminal proceeds. *United States v. Hooper*, 229 F.3d 818 (9th
Cir. 2000). An interest in criminal proceeds can only come into existence after the
crime giving rise to forfeiture has occurred. *Id*. (Pointed out that CAFRA adopted
the same standard applied in criminal forfeitures for innocent ownership). Thus,
an innocent owner claim to criminal proceeds can only be made by a bona fide
purchaser of the proceeds after the unlawful conduct occurred.

In this case, the Claimants do not acknowledge that an unlawful act giving
rise to forfeiture occurred. They simply challenge the government's case by
contending that the Defendant Currency came from legitimate sources,
independent of any narcotics transaction. *See United States v. Six Negotiable
Checks totaling $191,671.69*, 207 F.Supp.2d 677, 683 (E.D. Mich. 2002). They,
therefore, have not raised the innocent owner defense under 18 U.S.C. § 983(d).

38

## VII. Conclusion

The United States, hereby, submits this trial brief summarizing the

government's evidence and the applicable case law on the civil forfeiture of drug

proceeds.

Respectfully submitted,

DONALD J. DeGABRIELLE, JR.
United States Attorney

KATHERINE L. HADEN
Texas Bar No. 08677500
Assistant U.S. Attorney
Attorney-In-Charge
910 Travis, Suite 1500
P.O. Box 61129
Houston, Texas 77208
Phone: 713-567-9365
Facsimile: 713-718-3300

39

## CERTIFICATE OF SERVICE

I, Katherine L. Haden, Assistant United States Attorney, do hereby certify that a true and correct copy of the above and foregoing has been served on counsel of record via Certified Mail, Return Receipt Requested, on August 21, 2006, addressed to:

Attorneys for Claimants

Mr. Oscar De La Fuente, Jr.
Rio Grande Law Center
501 E. Tyler
Harlingen, Texas 78550
Telephone: (956) 425-5297
Facsimile: (956) 425-1844

Mr. Paul Fourt
1000 E. Van Buren
Brownsville, Texas 78520
Telephone: (965) 574-0109
Facsimile: (956) 574-0227

Katherine L. Haden
Assistant United States Attorney

40