IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. B-04-015 |
| v. | § | |
| | § | |
| | § | |
| $155,895 UNITED STATES CURRENCY | § | |
| Defendant. | | |

## UNITED STATES' MOTION TO EXCLUDE EXPERT TESTIMONY BY JOE RUBIO; OR ALTERNATIVELY, REQUEST FOR PRELIMINARY DETERMINATION UNDER FED.R.EVID. 104

The United States moves the Court to exclude the proposed expert

testimony of Joe Rubio under Rules 402, 403 and 702 of the Federal Rules of

Evidence. Alternatively, the United States requests the Court make a preliminary

determination regarding the admissibility of Joe Rubio's testimony under Fed. R.

Evid. 104(a).

### I. Factual Background

Claimant Omar Martinez, through his attorney Oscar De La Fuente, Jr., has

designated Joe Rubio Jr. as a retained expert witness who will provide testimony

"concerning the facts and circumstances surrounding the incident forming this

suit." Such testimony would include "probable cause, validity for the search and

seizure, training and use of the canine in question, proper training of the canine

handling officer, proper custody and control, chain of command, accounting of the seized currency and the proper issuing of receipts for said currency" (Designation letter is attached as Exhibit "A").

Although the Claimants Esteban Martinez Sr., Esteban Martinez Jr., and Julissa Trevino never formally designated an expert for trial, they recently filed a Motion for Order Compelling Discovery and/or Motion to Exclude Evidence Pursuant to Fed.R.Civ.P. 37, requesting the court to exclude evidence of the positive dog alert because the government failed to retain the Defendant Currency for potential testing by their "expert" Joe Rubio Jr.[1] Even if Omar Martinez's designation of Rubio as an expert is deemed to extend to the other Claimants, at no time did any Claimant designate Rubio as an expert in the area of forensic science or analytical chemistry.

In response to the above motion, the United States argued that Rubio's resume demonstrates that he did not receive education or training in forensic science or chemistry to qualify him to test or examine the Defendant Currency in the manner suggested by the Claimants, much less draw conclusions from such

---

[1]Claimants Esteban Martinez Sr, Esteban Martinez Jr. and Julissa Trevino contended in their motion that Rubio would have performed tests three years after the seizure to determine whether there was any controlled substance residue on the currency, what type of controlled substance was present, whether the dog alerted to another smell, and whether the dog alerted to the container rather than the currency under the "contamination theory."

examination or tests. In the event the Court permits the Claimants to present evidence or argument suggesting they could have made certain determinations had the currency been available, the government requested permission to rebut that evidence with the expert testimony of Dr. Kenneth Furton, PhD, or his counterpart Dr. Stefan Rose M.D. Both of these men are the leading experts in this area and have published numerous articles about the reliability of dog alerts to the odor of a controlled substance, the contamination theory, and other matters.[2] *See* Fed.R.Civ.P. 26(a)(2)(C)(Permits a party to disclose expert testimony to rebut or contradict on the same subject matter identified by another party within 30 days after the disclosure by the other party).

As a part of Omar's expert designation, the government was provided with a copy of Joe Rubio's resume and report dated March 27, 2006 (attached as Exhibit "B"). Rubio's resume reflects no special training or certification for handling

---

[2] On August 17, 2006, the Claimants filed a Motion to Exclude Officer Ramiro Martinez's testimony under Fed.R.Evid. 702, claiming his testimony is scientifically unreliable. The United States designated Officer Martinez as a potential expert as a certified dog handler, not as an expert in the area of forensic science or analytical chemistry. At depositions, counsel for the Claimants questioned Officer Martinez, over the government's objections, as to whether it was possible that the suitcase, Karaoke machine and DVD player could have been "contaminated" by other luggage on the bus. Officer Martinez agreed that it was possible; although, he has no formal training or education in forensic science or analytical chemistry. Rather, Officer Martinez received training on how to handle and read a drug-detection dog during an inspection for the odor or presence of controlled substances. The United States will respond to the above motion in another pleading.

3

drug-detection dogs  and no training or education in the field of analytical chemistry or forensic science.  Nor does his resume reflect that he was ever assigned to the narcotics division or to a drug interdiction task force.  Rather, his resume reflects he resigned  from the Harlingen Police Department in January 2001–2 ½ years before the money seizure in this case, and since that time, has worked as a private investigator.

Rubio's resume reflects that his investigative experience at Harlingen Police Department consisted of "crimes against persons and property, narcotics, TABC violations, internal affairs, . . . and traffic accidents."  He states he supervised the Traffic Division from 1999 to January 2001. From 1993 to November 1999, he supervised patrol officers, jailers and communications officers. From November 1990 to May 1993, he was a sergeant in the Traffic/Communications Division/Jail Division. Prior to that he worked as a patrol sergeant, and from October 1988 to January 1990 he was assigned to investigate crimes against property.  During that time, he assisted in crimes against persons and narcotics investigations "as assigned." From 1981 to October 1988 he was a patrol officer.

In Rubio's  "investigator's report," he states he has familiarized himself with this case by reading unidentified information contained in two notebooks and interviewing Omar Martinez. He then proceeds to either ask legal questions, or

4

draw legal conclusions, from information provided by Omar regarding whether the

officer's encounter with Omar qualified as a detention, whether the encounter was

legally proper, whether the search or seizure of Defendant Currency was supported

by reasonable suspicion or probable cause, whether Omar gave lawful consent,

and so forth. Rubio further isolates circumstances in his report and opines that the

circumstance alone is insufficient to support reasonable suspicion or probable

cause. He also provides erroneous legal definitions or standards on the application

of probable cause and burden of proof in forfeiture cases.

The manner in which Rubio regurgitates information provided by Omar is in

an argumentative format, assuming the state of mind of the police officer and the

legal status of the events. For example, Rubio states in his report that Officer

Martinez boarded the bus and "singled out" Omar for questioning without any

prior knowledge that Omar might be carrying large amounts of currency; and that

once Omar was "detained" outside the bus, the interview continued.

Rubio asks numerous rhetorical-type questions in his "investigator's report"

without providing any opinion. For example, Rubio poses questions regarding

how the dog alert was conducted, but provides no opinion or the underlying reason

for the opinion. As to any part of the report that might be liberally construed as a

proposed opinion or statement, Rubio fails to provide the basis or reason for the

5

statement. His report is also unsigned, does not disclose the amount he is to be compensated for his report and testimony, and does not list other cases in which Rubio has testified within the last four years.

## II. Legal Argument

A district court is afforded wide latitude in determining the admissibility of expert testimony. *Wilson v. Woods*, 163 F.3d 935, 936-37 (5th Cir. 1999). The burden for laying the proper foundation for the admission of expert testimony rests with the proponent. *Cook v. Sheriff of Monroe County, Florida*, 402 F.3d 1092, 1112-113 (11th Cir. 2005)(Trial court did not abuse discretion in excluding testimony in its entirety without a hearing where the expert witness offered only conclusory statements devoid of analytical support). Because of the powerful and potentially misleading effect of expert testimony, otherwise admissible testimony may still be excluded under Fed.R.Evid. 403 if its probative value is substantially outweighed by the potential to confuse or mislead the jury, or it is cumulative or needlessly time-consuming. *United States v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004).

Rule 702 of the Federal Rules of Evidence provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or

6

education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In determining whether Rule 702 is satisfied, the district court must make a preliminary determination under Fed.R.Evid. 104 that: (1) the proffered witness is qualified as an expert; (2) the proffered expert's testimony is based on scientific, technical or specialized knowledge that will assist the trier of fact to understand the evidence or determine a fact in issue; and (3) the proffered testimony is reliable. *See Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999); *Moore v. Ashland Chemical Inc.*, 151 F.3d 269 (5th Cir. 1998)(en banc).

"A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Wilson*, 163 F.3d at 937. Moreover, the court should exclude testimony that does not relate to an issue that the jury will decide since the testimony is unhelpful. *Moore*, 151 F.3d at 275. An expert's legal conclusions are unhelpful because the jury does not decide questions of law. Legal conclusions supply the jury with no information other than instructing the jury on what result to reach, and therefore, should be excluded from evidence. *See Cook*, 402 F.3d at 1112 n. 8 ("Courts must remain vigilant against the admission of legal conclusions, and an

7

expert witness may not substitute for the court in charging the jury regarding the applicable law"); *Nieves-Villanueva v. Soto-Riviera*, 133 F.3d 92, 99-100 (1st Cir. 1997)(We follow at least seven other circuits that prohibit legal conclusion testimony. "It is black-letter law that 'it is not for witnesses to instruct the jury as to applicable principles of law, but for the judge'"").

Further, the expert should testify about matters beyond the understanding and experience of the average citizen. "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers . . . can argue in closing arguments." *Frazier*, 387 F.3d at 1262.

In assessing the reliability of proffered expert testimony, the court should evaluate whether the reasoning or methodology underlying the testimony is valid, and whether that reasoning and methodology was properly applied to the facts in issue. The Supreme Court set forth a non-exhaustive list for trial courts to use in assessing the reliability of scientific expert testimony in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993). These factors include: (1) whether the expert's theory can be or has been tested – that is whether the theory can be objectively challenged or whether it is simply a subjective, conclusory approach that cannot be reasonably evaluated; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate

8

of error of the particular scientific technique; (4) the existence of standards and controls; and (5) whether the technique is generally accepted in the scientific community. *Id.,* 509 U.S. at 593-94, 113 S.Ct. at 2796-97.

The same criteria may be used to evaluate the reliability of non-scientific expert testimony depending on the particular circumstances of the case at hand. Not all of the *Daubert* factors will apply in every case, and in some cases, other factors will be equally important. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150-52, 119 S.Ct. 1167, 1175-76 (1999).

Courts have found other relevant factors for determining whether expert testimony is sufficiently reliable, to include: (1) whether the proffered expert proposes to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for the purpose of testifying; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995); (2) whether the expert has unjustly extrapolated from an accepted premise to an unfounded conclusion; *General Electric Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 518 (1997); and (3) whether the expert has adequately accounted for obvious alternative explanations. *Claar v. Burlington N.R.R.*, 29 F.3d 499 (9th Cir. 1994).

If the witness relies primarily on experience, then the witness must explain

9

how the experience leads to the conclusion reached, why that experience provides a sufficient basis for the opinion, and how that experience is reliably applied to the facts. *Frazier*, 387 F.3d at 1260. The proposed expert testimony must be supported by sufficient validation. *Id.*

In this case, it is unclear from Rubio's unsigned "investigator's report" what testimony he intends to provide. For example, regarding the dog alert, Rubio simply poses several questions, and then makes a general observation that "it has been noted that a majority of money passes through narcotics handling", and "the fact that money is made from a cloth material type allows for narcotics to penetrate and stay in money for a large amount of time."

With regard to statements he makes in his report, Rubio fails to provide the underlying grounds that support his statement(s). Thus, his report fails to comply with Fed. R.Civ.P. 26(a)(2)(B), which states that the written report shall be signed by the witness and contain a complete statement of all opinions to be expressed and the basis and reasons therefore, and the data or information considered by the witness in forming the opinion.

Notwithstanding, the Claimants have failed to establish that Rubio has the experience, training or education to qualify him as an expert to testify about the training and use of the canine and handler, Kai and Officer Martinez; including

10

whether the dog inspection was performed properly in this case or whether the positive alert was reliable. According to Rubio's resume, he has no specialized training, education or experience as a dog handler or dog trainer.

Nor does Rubio have the specialized training, education or experience to provide expert testimony on matters within the realm of forensic science or analytical chemistry. Rubio, therefore, should be precluded from testifying about the manner in which police conducted the dog inspection, the reliability of the positive dog alert for the odor of a controlled substance on the Defendant Currency, whether the presence of a controlled substance is present on most currency in general circulation, whether the Defendant Currency was, or could have been, contaminated by other items on the bus, or other similar matters. *See Wilson*, 163 F.3d at 937.

Additionally, in Rubio's report, he sets out legal questions, definitions, or conclusions regarding whether Officer Martinez's encounter with Omar qualified as a detention, whether it was legally proper, whether the search or seizure of Defendant Currency was supported by reasonable suspicion or probable cause, or whether Omar gave lawful consent. Rubio's legal analysis, whether through questions, definitions or conclusions, invades the province of this Court and should be excluded from evidence. *Nieves-Villanueva v. Soto-Riviera*, 133 F.3d at

11

99-100; *Specht v. Jensen*, 853 F.2d 805, 807 (10ᵗʰ Cir. 1988)(Held expert's legal

opinion whether search was consensual or required a warrant was reversible

error); *Brandon v. Village of Maywood*, 179 F.Supp.2d 847, 852 (N.D. Ill.

2001)(Expert could not provide opinion about the application of legal standards

such as probable cause or reasonable suspicion, but was limited to describing

sound professional standards and identifying departures from them).

Moreover, his legal analysis and conclusions are irrelevant to any factual

issues for the jury to decide. Any search and seizure issues in this forfeiture action

are issues for the court to resolve, and the court does not need a private

investigator to interpret the law for it. Rubio's lack of expertise in interpreting the

applicable law is demonstrated by his application of erroneous legal standards and

definitions. For example, Rubio incorrectly isolates a factor and concludes it could

not form the basis for reasonable suspicion or probable cause. *See United States v.

$83,310.78*, 851 F.2d 1231, 1236 (9ᵗʰ Cir. 1988)(Held that reasonable suspicion or

probable cause is to be assessed by the totality of the factors, and not parceled

out). He further provides legal definitions or applications for probable cause and

burden of proof that are no longer applicable after the Civil Asset Forfeiture

Reform Act of 2000.

Further, the manner in which Rubio regurgitates information provided by

Omar is in an argumentative format as if presenting an opening statement or closing argument. Placing a spin on the information to be considered by the jury does not assist the jury. *See Frazier*, 387 F.3d at 1262 (Testimony that offers nothing more than what lawyers can argue in closing argument does not assist the trier of fact). The jurors are the ultimate arbitrators of the facts, credibility and weight to be given the evidence.

Lastly, Rubio states in the report that Harlingen Police Department (HPD) "should" have a policy on how seized money is counted; and then on the other hand, he states that Investigator Silva violated HPD's departmental rules by failing to account for seized property. Is he stating the HPD had a policy or not. He also offers the opinion that defendants who are caught in suspicious circumstances rarely contest large money seizures. This opinion is contradicted by numerous forfeiture cases wherein defendants caught in suspicious circumstances indeed contest large money seizures.

Rubio then goes on to discuss Omar's claim that an additional $20,000 was seized from police, offering his opinion "that experience and common sense would tell you that most people know how much money they are carrying," and that the money should have been counted in front of Omar Martinez. The information he relies upon is questionable in light of evidence that several police officers have

13

stated that Omar was present and in the room while they counted the money, and that Omar stated he did not know the exact amount of cash he carried and invited them to count it. Police did not report the official count until the money was deposited into a bank.

Rubio fails to explain the basis for the above opinions, other than an ordinary person's common sense, observations or experience. His testimony does not cover matters beyond the understanding and experience of the average citizen, and therefore, would not assist the trier of fact to understand the evidence or determine a fact in issue. The HPD policies on counting seized money has no relevance to whether the Defendant Currency is subject to forfeiture or to any defense to forfeiture. Irrelevant evidence is inadmissible. *See* Fed.R.Evid. 402. Therefore, Rubio's testimony on irrelevant matters would not assist the jury in determining a fact in issue. *Frazier*, 387 F.3d at 1262. Regardless, whether Harlingen Police Department had certain policies, and whether those policies were broken, are verifiable without an expert. *See Id.*

## III. Conclusion

Since virtually all of the information on Rubio's "investigator's report" is excludable under Fed.R.Evid. 402, 403 and 702, the United States respectfully requests that the Court exclude his testimony at trial. Alternatively, the United

14

States requests the Court make a preliminary determination regarding the

admissibility of Rubio's testimony under Fed.R.Evid. 104(a).


                              Respectfully submitted,

                              DONALD J. DeGABRIELLE, JR.
                              United States Attorney


                              KATHERINE L. HADEN
                              Texas Bar No. 08677500
                              Assistant U.S. Attorney
                              Attorney-In-Charge
                              919 Milam, Suite 1500
                              P.O. Box 61129
                              Houston, Texas 77208
                              Phone: 713-567-9365
                              Facsimile: 713-718-3300

## CERTIFICATE OF SERVICE

I, Katherine L. Haden, Assistant United States Attorney, do hereby certify

that a true and correct copy of the above and foregoing has been served on counsel

of record via Certified Mail, Return Receipt Requested, on August 22, 2006,

addressed to:

Attorneys for Claimants

Mr. Oscar De La Fuente, Jr.
Rio Grande Law Center
501 E. Tyler
Harlingen, Texas 78550
Telephone: (956) 425-5297
Facsimile: (956) 425-1844

Mr. Paul Fourt
1000 E. Van Buren
Brownsville, Texas 78520
Telephone: (965) 574-0109
Facsimile: (956) 574-0227

Katherine L. Haden
Assistant United States Attorney

16

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. B-04-015 |
| v. | § | |
| | § | |
| | § | |
| $155,895 UNITED STATES CURRENCY | § | |
| Defendant. | | |

## ORDER

The United States' motion to exclude the testimony of Joe Rubio, Jr. under

Fed.R.Evid. 402, 403, and 702 is hereby GRANTED.

_____
JUDGE ANDREW S. HANEN
UNITED STATES DISTRICT JUDGE

## EXHIBIT TABLE OF CONTENTS

EXHIBIT A    -    Designation letter dated December 6, 2005

EXHIBIT B    -    Rubio's Investigator's Report dated March 27, 2005



# Oscar De La Fuente, Jr.

Attorney at Law

December 6, 2005

***VIA FACSIMILE (713) 718-3404***
***and CMRRR #7003 0500 0002 3836 6160***

KATHERINE L. HADEN,
Assistant U.S. Attorney
P.O. Box 61129
Houston, Texas 77208

> ***Re:*** **Civil Action No. B-04-015**
> ***The United States of America vs. $155,895 United States Currency***

Dear Ms. Haden:

In reference to the case above, please be advised that the experts designated in correspondence dated December 1, 2005, will offer testimony concerning facts and circumstances surrounding the incident forming the basis of this suit. Such testimony will include but will not be limited to probable cause, validity for the search and seizure, training and use of the canine in question, proper training of the canine handling officer, proper custody and control, chain of command, accounting of the seized currency and the proper issuing of receipts for said currency. Intervener anticipates retaining these experts. Jose Rubio, Jr.'s resume is attached hereto and incorporated by reference. Any other resumes and/or reports will be supplemented at a later date.

Thank you for your time and attention to this matter. Should you have any questions, please feel free to contact my office.

Sincerely,

*Oscar De La Fuente*

Oscar De La Fuente, Jr.

ODLF/yg

Exhibit A

**RGV PRIVATE INVESTIGATIONS NETWORK**

2309 Hacienda Road
Harlingen, TX 78552
956-536-6515 or 956-202-2999
www.rgvinvestigations.com
Email: rgvpin@aol.com

**Investigator's Report**

**Client: Oscar De La Fuente, Attorney at Law**
**From: Joe Rubio c/o RGV Private Investigations Network**
**Case: Civil Asset Forfeiture-Omar Martinez vs. US**
**Case#: 05-039**
**Date: March 27, 2006**

<u>Pre-Surveillance/Report Information</u>

I have familiarized myself with the information contained in the two large notebooks titled Omar Martinez vs. US. After a review of the information, I decided to interview Omar Martinez and do some research on this case.

I interviewed Omar Martinez on January 9, 2005. He inherited some money from a lawsuit where his mother died. My interview revealed the manner of the stop and detaining of Mr. Martinez on August 4, 2003. Harlingen Police Department officers confiscated a sum of $155,895 on that date.

<u>Investigative Findings/Report:</u>

1. The first approach to an investigation is the who, what, how, etc. that occurs on any incident. Mr. Martinez was returning from a business trip and had boarded a bus from Houston to Harlingen on August 4, 2003. His wife was waiting for him across the street where the bus dropped him off. He had an expectation to depart the bus, pick-up his baggage, and join his wife. Instead Harlingen Police Officer Ramiro Martinez boarded the bus and singled out Mr. Martinez for questioning. In as far as the investigative statements indicate, Officer Martinez had no prior knowledge that Omar Martinez may be carrying a large amount of money. He relied on his training and experience to single out Mr. Omar Martinez. If Mr. Martinez failed to maintain eye contact and looked away from Officer Martinez's casual observation, the question that arises: Is this inadvertent behavior sufficient enough to create suspicion for probable cause to be extended and further investigative questioning to continue? Lack of eye contact does not constitute reasonable suspicion.

2. Once Mr. Martinez was detained outside the bus and the interview continued, was there consent for Officer Martinez to began his exploratory search? Was this consent in writing, orally given, or never obtained?

Exhibit B

3. Once the large amount of money that was found concealed in the karaoke player and DVD player, was Mr. Martinez free to go or was his escort to the Harlingen Police Department voluntarily?

4. The fact that Mrs. Martinez and her child were asked to follow the police to the Harlingen Police Department may have played on Mr. Martinez's mind. Did the police have the legal right to ask Mrs. Martinez to accompany the police officers to the Harlingen Police Department? Was this voluntary?

5. The interview of both Mr. and Mrs. Martinez could be considered coercive due to the nature of both parties being held for questioning. Were they advised they were free to go?

6. Upon completion of the interview, Mr. and Mrs. Martinez were free to go and Mr. Martinez was advised the Harlingen Police Department would be confiscating his money. Why wasn't the entire amount of money seized counted out in front of front of both Mr. and Mrs. Martinez? Omar Martinez was issued a receipt for miscellaneous cash.

7. The Harlingen Police Department should have a policy in place where all seized property is accounted for and the owner of the property should sign the receipt. The failure to count the money taints the entire process of a seizure where the credibility of the department and the actions of the officers arises.

8. Mr. Omar Martinez is making a claim that approximately $20,000 was taken by the officers and not submitted for asset forfeiture. Experience and common sense will tell you that most people have an accurate idea of how much money they have in their possession. Unfortunately, this investigator did not get involved in this case until after two years had transpired. I informed Mr. Martinez that all though he could submit an internal affairs complaint against the officers who failed to note accurately the amount of money seized- two plus years later would be rather difficult for any police department to properly investigate the incident in question. Officer Leo Silva who failed to properly account for seized property violated the departmental rules of the Harlingen Police Department.

9. Defendants who are caught in suspicious circumstances rarely contest large money seizures. If the police were relying on probabilities, it would have been convenient for the money not to be counted in front of Mr. and Mrs. Omar Martinez.

10. A K-9 dog was used to detect narcotics on the seized money, the following questions arise:

    a. Was the K-9 search/alert conducted in front of Mr. Martinez?

    b. Was the incident filmed?

    c. How many officers were present during this alert?

    d. Was the K-9 alert on one stack of money, several bills, or the entire amount?

    e. Statistically speaking, it has been noted that a majority of money passes through narcotics handling. The fact that money is made from a cloth material type allows for narcotics to penetrate and stay in money for a large amount of time.

    f. Did the K-9 alert the first time, second time, or afterwards? This is important because the dog may be alerting to a conditioning reflex based

on the game that he is playing in finding the money and the reward that follows.

11. The definition of probable cause is important as it plays an integral part on this case. The definition is as follows: A standard of proof that would lead a reasonable person (police officer) to believe a certain condition or fact (that a crime is or will be occurring or has occurred) exists. This is the standard necessary for police officers to conduct a stop and frisk. *"An Introduction to Policing,"* 3rd Edition, Copyright 2005-Authors: Dempsey & Forst.

12. Pursuant to: *Federal Forfeiture Guide Newsletters, Frank O. Bowman III & Roger W. Haines, Jr.*

   a. *Nexus to Illegal Activity Generally: Government failed to establish probable cause of a "substantial connection" between seized currency and criminal activity."*

   b. *Burden of Proof: After the government establishes probable cause for forfeitures of real property and vehicles, the burden "shifts" to claimant to rebut that presumption.*

   c. *Probable cause can only be established with evidence that existed at the time the government filed the forfeiture complaint.*

   d. *Probable cause did not exist to support forfeiture of cash due to complete lack of evidence connecting the seized money directly to illegal narcotics.*

## Comments & Further Procedures

This report is submitted for your review. The attorney/client privilege is extended to this report. This report and my cover letter were prepared in a manner that extends investigative findings to the case where three major issues arise:

1. Did the Harlingen Police Department officer have enough reasonable suspicion to single out Mr. Martinez?

2. The fact that you have a receipt where the entire amount of money seized was not counted out in front of Mr. Omar Martinez raises the issue of the credibility of the officers seizing the money. If deposed, would their personal financial status be open to an exploratory inquisition?

3. The Federal Forfeiture Guide Newsletters play a major factor in the burden of proof that rests on the government.

Further case law research and investigations may be warranted based on a follow-up with you and the direction that the government takes on this case.

## RESUME
### Jose Rubio, Jr.
### 2309 Hacienda Road
### Harlingen, TX 78552
### 956-425-1998/956-536-6515

**JOB TARGET:**

      **Updated Resume for Oscar De La Fuente**

**Work History:**

    *RGV Private Investigations Network*
    **January 3, 2001- Present time**
    Owner/Manager of private investigations company
    Investigations & consulting for all types of cases
    Criminal & civil cases analysis for attorneys & private clients
    Company employs part time investigators to assist in cases
    Supervision and direction of employees as needed
    Networking with other professionals as needed on cases
    Website: rgvinvestigations.com.

    Jona Enterprises DBA: *Rubio Construction*
    **October 1998-Present time**
    Owner/Manager of Construction Company. Company set up for investment
    purposes, acquisition of real estate and construction of new homes.
    Company is licensed under the *Texas Residential Commission.* Company
    does extensive networking with sub-contractors. Company bids on
    remodeling jobs as needed.

    **Harlingen Police Department: Retired after nineteen years of service.**
    **Rank of lieutenant-Administration of police personnel.**
    **Investigative experience: Crimes against persons & property, narcotics,**
    **TABC violations, & internal affairs.**
    **Instruction of law enforcement officers.**
    **Traffic Accident Investigations-advance level.**
    **Supervision of: Traffic Division/Patrol/Jail/Communications**

    **US Army: Assigned to 561st Military Police Company Ft. Myer, VA**
    **July 17, 1978-July 16, 1981-Rank Specialist IV**
    **Assigned to the Special Services Division to oversee special projects**
    **& traffic citations division**
    **Participated in special assignments with security details in Washington D.C**
    **Assigned to patrol duties and gate entrance security**

**Page 2**
**Rubio Resume**

## PRIVATE INVESTIGATIONS EXPERIENCE

**Criminal Investigations: Injury to a Child, Theft by Public Servant, Official Misconduct by Public Servant, Failure to Stop & Leave Information and Render Aid at the Scene of an Accident, Involuntary Manslaughter Case, Theft of Motor Vehicle, Homicide Investigation (death row case)**

**Civil Investigations: Street and parking lot accident investigations, background investigations, child custody issues, business fraud, asset forfeitures investigation, mold & mildew, police misconduct, spouse dishonesty cases, and workers comp.**

**Arbitration/Deposition Experience/Attorney Consultation/Trial Preparation**

## LAW ENFORCEMENT EXPERIENCE

**November 1999-January 2, 2001: Harlingen Police Department Lieutenant supervising the traffic department. Designed and maintained an accident database for statistical purposes. Retired from the Harlingen Police Department at the rank of lieutenant.**

**August 1993-November 1999: Served as a patrol lieutenant assigned to oversee a shift, supervising two sergeants and patrol officers. Supervised the jailers on duty and the communication officers.**

**May 1991-July 2000: Certified T.C.L.E.O.S.E. Instructor-provided instruction to law enforcement officers on a part-time basis as assigned. Developed lesson plans from research and practical experiences; mental health education for officers, personnel evaluations, supervision of police personnel, and crime scene photography.**

**November 1990-May 1993: Served as a supervisor (sergeant) in the Traffic/Communication Division/Jail Division. Duties were to coordinate the responsibilities of each division. Instituted a training program for dispatchers. Conducted internal affair investigations and made recommendations on findings.**

**January 1990-November 1990: Sergeant assigned to patrol shift with watch commander responsibilities and supervision of patrol officers.**

**October 1988-January 1990: Assigned to the detective division investigating crimes against properties. Assisted on investigations of crimes against persons and narcotics as assigned. Developed interview & interrogation skills.**

**September 1981-October 1988: Patrol officer handling all type of calls for service and developing a rapport with the public. Assigned to community relations.**

**July 1978-July 1981:  US Army Military Police Officer**

Page 3
Rubio Resume

## SPECIALIZED EXPERIENCE & DUTIES

Instruction of law enforcement officers in the following:

- Police Instructor Development-40 hour course
- Police Supervision Course 3737-24 hour course
- Personnel Evaluations-16 hour course
- Mental Health Education for Officers-8 hour course
- Crime Scene Photography-16 hour course
- Arrest Search & Seizure-16 hour course
- Legal Update-8 hour course

Promotion of special events and coordination of donations:

- The Blue Santa during Christmas;
- Youth sponsorships;
- Coordinating donations for various charitable organizations;
- Coakley School Literacy Contest;
- Loaves & Fishes;
- End of the Road;
- Family Crisis Center;
- Texas Special Olympics;
- H.P.O.A. Annual All-Male Style Show;
- Valley Morning Star Rio Run volunteer committee

## ADDITIONAL SKILLS

- Criminal history checks, driver license checks, & license plate registrations.
- Familiar with Microsoft Office: Word, Excel, Access, and Power Point
- Familiar with Peachtree Accounting and QuickBooks
- Familiar with Adobe products line; Photoshop, PageMaker, InDesign.
- Familiar with Quark Express with layout of newspapers/magazines.
- Familiar with Corel Draw-Corel Photoshop.
- Bilingual skills: Ability to converse in Spanish and read/write Spanish.
- Tax preparation: Preparing annual tax returns for individuals.
- Photography: Extensive knowledge of both digital and 35mm photography. Photos published in *Valley Morning Star and The Leader* newspapers. Experienced in photo shoots of: accidents, weddings, portraits, and special events. Digital videography experience.

## ACHIEVEMENTS

Fraternal Order of Police Texas State Lodge appointment: legislative and recruitment committee for the term 2004/2005

Awarded "Supervisor of the Year" in 1997 by the Harlingen Police Association.

Page 4
Rubio Resume

Appointed to the Board of The Good Shepherd Center in 1996.

Appointed to the Cameron County Emergency Services Board in 1997.

President of the Harlingen Police Association-1992

Part of the original steering committee, which created S.T.O.P. (South Texas Organization of Police). S.T.O.P. is a Rio Grande Valley Association of Law Enforcement Officers.

Appointed to the Pay Benefits Committee in the City of Harlingen.

Appointed to the Texas FOP Legislative Committee during the 76th Legislature (1998/1999). Presented HB 1078 to State Representative Jim Solis and house bill affecting benefits to fire fighters and police officers was passed during the legislative season.

Appointed to the National FOP Border States Committee in 1997/1998. Represented Texas law enforcement officers in border related crime problems. Part of the team that made extensive research for a report to a Congressional committee overseeing law enforcement problems in the United States.

## EDUCATION & PROFESSIONAL AFFILIATIONS

| | |
|---|---|
| To Date: | Continuing education in the field of private investigations |
| To Date: | Continuing education in the field of home construction. |
| October 1995: | Masters Peace Officers Certification obtained from the Texas Commission of Law Enforcement Standards and Education |
| May 1988: | Completed 118 hours of college credit towards degree in Police Administration |
| May 1986: | Received Associate Degree in Applied Science with major in Law Enforcement Technology from Texas Southmost College |
| March 1982: | Graduated from the Lower RGV Police Academy |
| May 1981: | Attended Park College-Fort Myer, VA |
| November 1978: | Graduated from United States Army Military Police School |
| May 1978: | Graduated from Harlingen High School |

## CERTIFICATIONS & LICENSES

- Licensed by the Texas Commission on Private Security: RGV Private Investigations Network A10143
- Licensed by the Texas Residential Construction Commission
- Licensed as a Concealed Handgun Carrier
- Law Enforcement Certifications: Master Peace Officer, DWI Intoxilyzer Certification, S.F.T.S. Certified (DWI/DUI), TCLEOSE Instructor License, Intermediate & Advanced Accident Vehicle Investigations

Page 5
Rubio Resume

## SPECIALIZED TRAINING/SCHOOLS

- **Railroad Grade Crossing Collision Investigation**
- **Practical Fire Origins & Cause Investigative Techniques**
- **Criminal Environmental Law Enforcement & Investigations**
- **Texas Alcoholic Beverage Codes & Regulations**
- **Burglary, Theft, Credit Card Abuse, and Forgery Investigations**
- **Homicide & Assault Investigations**
- **Auto Theft Investigations**
- **Kidnap & Extortion Investigations**
- **Tactical Raid Planning**
- **Interview & Interrogation Techniques**
- **Kinesics Interview Techniques**
- **Narcotics Detection Techniques**
- **Elderly & Child Abuse Investigations**
- **Street Survival/Patrol Tactics**
- **Human Relations training**
- **Management & Supervision training -Texas Municipal League**
- **Sexual Harassment training-Texas Municipal League**
- **Hazard Materials Safety**
- **High Performance Work Teams, Professional Development, Personnel Leadership**
- **Collective Bargaining**
- **Employee Discharge & Documentation in Texas**
- **Fair Labor Standards Act training & practical experience**
- **Introduction to Insurance Adjusting**
- **Building the Investigative Practice**